Lucas vs. The Milwaukee & St. Paul Railway Company.

*By the Court.*—Judgment affirmed.

A motion for a rehearing was denied at the June term, 1873.

LUCAS V. THE MILWAUKEE & ST. PAUL RAILWAY COMPANY.

RAILROADS.    (1–4) *Liability for injury to persons taken as passengers on freight trains.* (5, 6) *Evidence to fix such liability.*
ERROR, *when not fatal:* (7) *In admission of evidence.* (8) *In instructions.*

1. Where a railroad company permits passengers to be usually carried on *some* of its freight trains, if a person goes aboard one of its freight trains supposing it, in good faith, to be one of those on which passengers are thus carried, and not being informed of the contrary before receiving an injury to his person caused by the management of the train, and there being nothing in the situation or condition of the train showing that passengers are not carried upon it as well as upon any other freight trains of the company, such person will have the rights of a passenger in respect to such injury; and especially will this be so if he is directed to go aboard by the conductor of the train, although such conductor has in fact no authority from the company for that purpose.

2. In an action for injuries received by plaintiff in being thrown from the platform of a caboose attached to a freight train of the defendant company, where it appeared that the company permitted passengers to be carried upon *some* of its freight trains, and that plaintiff went aboard said caboose not knowing that the train was not one of those authorized to carry passengers, and not being informed to the contrary before going aboard, nor before receiving such injuries, but having been directed to the train and permitted to go aboard of it by a person whom the jury, from the evidence, might have found to be an employee of the company, and perhaps one of the conductors of said train: *Held*, that upon these facts the jury might find plaintiff was lawfully aboard such caboose as a *passenger*.

3. It appearing that the defendant's ticket office was not opened for the sale of passenger tickets except at or about the times of the departure of regular passenger trains, though passengers were allowed to be carried on some of its freight trains, and it not appearing that the

trains last mentioned came to the passengers' platform, nor that there was anything in the external appearance of the caboose in this case to indicate that it was not adapted to the carrying of passengers, plaintiff is not chargeable with notice that the train here in question would not carry him as a passenger, from the fact that it was not brought to the platform, nor from the fact that the caboose was not convenient for passengers, nor from his knowledge that the ticket office was not open at or about the time of its departure.

4. If the liability of the company depended upon the train which the plaintiff was upon being in fact a passenger train, the fact that the conductor had permitted persons to ride upon it on two or three occasions, and collected fare, would not be sufficient; but the proof should show that the train carried passengers habitually or frequently.

5. *It seems* that it was competent for two witnesses on behalf of the plaintiff to testify that a short time before the accident here in question they traveled a short distance on the same train, and paid fare to the conductor; although this court is of opinion that there was not enough evidence of that character to justify the jury in finding that such train was a passenger train.

6. It was competent for plaintiff to prove conversations held at the time by him (or by members of the company with which he got aboard the train) with the person who directed them to such train, tending to show that he was an employee of the company.

7. Where evidence of a fact was improperly rejected, but the fact was afterward proven and was an undisputed fact in the case, the error is unimportant.

8. Where the charge to the jury, though erroneous in some respects, was more favorable to the appellant than would have been the instructions which respondent had a right to ask, the judgment will not be reversed for such errors.

[DIXON, C. J., for reasons assigned, withholds any expression of opinion in the case.]

APPEAL from the Circuit Court for *Dane* County.

This is an action to recover for personal injuries. On the evening of November 5, 1870, Conner Howard, Mathew Dunn and his wife, Mrs. Lucas and her son *Michael*, the plaintiff, who was then a little more than eight years of age, being desirous to go from Madison (where they then were), to McFarland, on the line of the defendant's railway, and having ascertained that a train was to leave Madison (which would pass through

the latter place) at about eleven o'clock on that evening, went to the depot of the defendant about twenty-five minutes before that time, for the purpose of taking passage on such train.

The occurrences from the time the party reached the depot until the plaintiff was injured, can be best stated by giving an extract from the testimony of Conner Howard, which, in the material particulars, is uncontradicted. It is as follows: "I went into the passenger depot; the rest stood on the platform. I then went out to the west end of the eating house building, and met a man there. He was standing a few rods west of the eating house [about ten rods from the train]; a train stood on the north side of the depot. It extended east and west of the depot. He was within ten rods of the caboose. He was east of the caboose, which was on the west end of the train. He stood at the west end of the depot platform, between the tracks; west of the baggage room. He was a small man, about my size; carried a railroad lantern lighted. He stood there; he had some tickets or something in his hand, that he was looking over, the same as if he was taking down numbers. I asked him where the train was that was going to McFarland. He told me it stood on the second track from the depot, and stood a little ways up that way, and pointed towards it with his hand. I then went up to where the rest of them stood on the platform. We then all came back to where the caboose was. I met the same man as I was coming back, within a rod or a rod and a half of the caboose. I could then see it. I asked him how soon they would be going out. He said the caboose stood there, and to get on; that they were going to get out in a few minutes. When we came close to the caboose, another man got in ahead of us. I don't know who he was. He had a satchel, and got on ahead of us. He got on at the forward end of the caboose. I saw him get on, and he went into the caboose door. The door was open. I got on the platform then. I helped the child on, and stood him inside of me on the platform; I was on the steps. I helped him up and

put him on the platform. I helped his mother on then. Before I hardly had time to let go her hand, the cars gave a sudden bump and pitched the boy off. I heard a scream behind me, and saw her down between the cars too. She made a drop after him. I then turned, took hold of her, and pulled her back. I then jumped off on the north side. The boy went off the platform between the rails. The train made a bump as if to couple, and back it went about the length of one car."

The boy mentioned by the witness is the plaintiff, and he was so injured by being thrown from the platform, that one of his arms was necessarily amputated between the wrist and the elbow. The arm was doubtless crushed by one of the car wheels passing over it when he was under the train.

The train had been opened at a street crossing, and the concussion which threw the plaintiff off the platform was caused by coupling the parts together. This was done by the conductor who took the train at Madison, the caboose and all of the employees on that train having been changed there; and he testifies that he made coupling without a lantern; that the head of the train moved back for that purpose very slowly; and that after the coupling was made the train did not move back more than four feet. Also that the bell was rung for the crossing, although not likely to be heard at the rear of the train, should the wind blow from the west. All of the employees on the outgoing train were called as witnesses, except the engineer, who left the road several months before the trial; and each testified that he knew nothing of the presence there of the plaintiff and the party with him, until after the accident. None of the employees on the incoming train were called as witnesses.

This train was a through freight train, and was put on the road and commenced running in August preceding. By the regulations of the railway company, the defendant, its through freight trains did not carry passengers; but its way freight

Lucas vs. The Milwaukee & St. Paul Railway Company.

trains were allowed to do so, and this regulation appeared on the time tables of the company. Usually, but not always, the cabooses on way freight trains were different from those on through freight trains.

Conner Howard further testified on cross-examination as follows : " I believe the window in the ticket office was shut up when I went there the first time." (This was between eight and nine o'clock of the same evening.) " I didn't try to buy a ticket there, because I understood they didn't sell tickets for freight trains. This was a freight train. When I went down the second time, I went into the passenger depot. The ticket office was then shut. I didn't try then to buy a ticket, because there was no place to buy a ticket at. I understood then that they didn't sell tickets for freight trains. * * * * I knew that every freight train carried passengers — all I have ever seen. I saw one passenger going on to it." This was the person with the satchel spoken of by Howard in his direct examination ; and the conductor testified that he collected twenty-five cents fare of him, and expended it for beer for the train hands. There was evidence that on two occasions one or more passengers had been carried on this train, and paid fare to the conductor. The station agent testified that " the ticket office windows are only opened for a half hour before passenger trains leave."

The jury viewed the ground where the accident happened and where the train stood, and also the caboose in question, which was placed at the point where it stood when the plaintiff was injured. The instructions given to the jury by the court, and the proposed instructions which were refused, are sufficiently stated in the opinion.

Verdict for the plaintiff; and from a judgment duly entered thereon the defendant appealed.

*John W. Cary*, for appellant:

1. The general public are not authorized to go on board of freight trains as passengers, and are trespassers in so doing ;

and where the rules of the company prohibit the carrying of passengers on such trains, the fact that the conductor in charge occasionally allows persons to ride on such a train, and col lects fare from them, in violation of the company's rules and without its knowledge, does not make the train a passenger train, nor authorize persons to go aboard thereof as passengers without a special permit or agreement; and such special permit given by the conductor of a freight train would not make even the person receiving it a passenger, so as to give him any rights as such against the company. Much less would it have the effect to change the train from a freight to a passenger train as to the public generally. A freight conductor has no such authority. *Elkins v. B. & M. R. R. Co.*, 3 Foster, 275; Judge REDFIELD's note to *Dunn v. Grand Trunk R'y Co.*, 10 Am. Law Reg., N. S., 615. The instructions given on this question were misleading and erroneous. The fact that a person had occasionally been allowed to ride as a matter of favor, did not authorize the court to leave it to the jury to find that the public was generally invited or authorized to ride on this train. No such presumption would arise if some persons had been allowed to ride by permission of the company; much less where it was only the unauthorized act of the conductor, and the fare collected never reached the company. The court erred also in receiving the testimony of Green and Miss Teed on that subject; in admitting the testimony of Conner Howard as to what was said to him by some unknown person about getting upon the train; and in rejecting the defendant's offer to show, by the conductor, that the carriage of passengers on this train was forbidden by the company. It also erred in refusing to instruct the jury, at defendant's request, that "there was no proof in the case of the relation of passenger by the plaintiff to the defendant, and hence that he could not recover."

*Orton, Keyes & Chynoweth*, for respondent:

1. The plaintiff was rightly on the platform of the caboose as a passenger: (1) Because the jury had the right to find that

the man with a railroad lantern by whom the plaintiff was directed to the train, was acting for the company in relation to that train. The inevitable inference from the evidence is, that this was the conductor who had come in with the train, and was checking off his bills of the train and preparing them for delivery to the new conductor. Proof of the actual authority of railroad employees and agents, acting at the time in charge of the company's business and property, publicly and in the proper place, is not necessary; but it is *presumed*, in the absence of proof to the contrary, that they have such authority. *Winkfield v. Packington*, 12 Eng. C. L., 281. "It is a question of fact for the jury, whether a person acting in a certain capacity is authorized." Story on Agency, §§ 130, 133. (2) Because this train was in the habit of carrying passengers, and carried one on this same occasion, from whom, as such, the fare was collected; and because it had a caboose attached, which was suitable for passengers, had carried them before, and stood near the depot convenient for passengers to get aboard. The employees might well have supposed that passengers desirous of leaving Madison for the east at that hour would at least attempt to get aboard of that caboose, especially when all the other freight trains on the road carried passengers. There was gross negligence on their part in not either guarding the caboose from the intrusion of persons who might try to get aboard of it without right, or seeing that they had a fair chance to get aboard as passengers, if they had a right. *Ohio & Miss. R. R. Co. v. Muhling*, 30 Ill., 9; *Gillenwater v. M. & I. R. R. Co.*, 5 Ind., 339; *P. & R. R. R. Co. v. Derby*, 14 How. (U. S.), 468; *Keating v. R. R. Co.*, Alb. L. J., March 18, 1871, p. 213; *Nolton v. Western R. R. Co.*, 15 N. Y., 444; *Edgerton v. R. R. Co.*, 39 id., 227; *Dunn v. Grand Trunk R. R. Co.*, 58 Me., 187; *O'Donnell v. R. R. Co.*, 59 Pa. St., 239; *Falvey v. Northern Transp. Co.*, 15 Wis., 129.

The following opinion was filed at the January term, 1873.

LYON, J.   If the relation of carrier and passenger existed between these parties at the time the plaintiff was injured, the instructions which the learned circuit judge gave the jury on the subject of negligence are applicable to the case, and doubt-less state the law correctly.   At least they contain nothing of which the defendant can justly complain.   The substance of all the instructions on this subject is to the effect that both the plaintiff, or those having the charge of him, and the employees of the defendant in charge of the train, were under a legal obliga-tion to use ordinary care to avoid the accident; that ordinary care is that degree of caution which persons of ordinary pru-dence would exercise under like circumstances; that if the plaintiff, or those having charge of him, failed to exercise that degree of care, and if such failure contributed to the injury received by the plaintiff, he could not recover in the action, even though the negligence of the employees of the defendant also contributed thereto; but that if the injury to the plaintiff was caused by the want of such ordinary care on the part of the employees of the defendant, the plaintiff and those having the charge of him being free from negligence, then, if the plaintiff occupied towards the defendant the relation of a pas-senger, he was entitled to recover.   The foregoing is believed to be a fair statement of the substance of the instructions to the jury on the subject of negligence, and it is not deemed necessary to set out the same at length.

There was sufficient testimony on the trial tending to show that the injury was caused by the negligence of the employees of the defendant in charge of the train, to make such instruc-tions applicable to the case; and there was not sufficient evi-dence to justify the court in holding, as a proposition of. law, that the persons who had the charge of the plaintiff were guilty of negligence which contributed to the injury.   The verdict necessarily negatived the existence of contributory negligence on the part of the plaintiff or those in charge of him, and affirmed that the injury was solely the result of the

negligence of the employees of the defendant. Such are the inevitable presumptions or inferences which, in view of the testimony and the charge of the court, must be deduced from the verdict for the plaintiff. It is not claimed that the plaintiff can recover unless the relation of passenger and carrier existed. The controlling question in the case, therefore, is, whether the plaintiff, at the time he was injured, was lawfully a passenger on the train of the defendant; or rather, does the testimony tend to prove that the plaintiff was lawfully on the platform of the caboose as a passenger on defendant's train at the time he was thrown off and injured ?

Upon this question, the circuit court refused to give the following instructions proposed by counsel for the defendant :

" 1. To constitute the relation of a passenger of the defendant, it being conceded that there was no express contract and no ticket bought, the train in question must be proved to be a passenger train used for the carrying of passengers.

" 2. If the train in question was not such passenger train, but merely a freight train, and the regulations of defendant were that passengers were not allowed to be carried in such trains, then the plaintiff had no right to enter upon the train, and defendant can not be made responsible, unless the employees in charge of the train knew of his presence and were guilty of negligence in view of such knowledge. And if the employees in charge of the train had no knowledge of plaintiff's presence on the caboose, or reason to believe he was there, and coupled the train in the usual manner, the plaintiff cannot recover.

" 3. If the employees of the defendant were prohibited from carrying passengers on the train, then defendant cannot be held liable in this case unless the plaintiff has shown that some person, having authority so to do, authorized plaintiff to enter upon the train

" 4. The occasional carrying of passengers upon a freight train proved on the part of the plaintiff in case to have occurred but twice, does not make it a passenger train and

authorize passengers to enter upon it, if the regulations of the company prohibited it.

" 5. If this train was a freight train, without any passenger car attached, and the regulations of the company prohibited the taking of passengers thereon, then the acts of the conductor, in some few instances, in taking fare of and carrying passengers would not authorize the plaintiff to attempt to enter the car as a passenger.

" 6. If the train was not a train for the carriage of passengers, the defendant is not liable, unless the employees of the train were guilty of gross negligence in coupling the train.

" 7. There is no proof in this case of the relation of passenger by the plaintiff to defendant, and hence he cannot recover."

The court gave to the jury the following instructions on the same subject :

" 1. The plaintiff cannot recover as a passenger of defendant, without showing that he occupied that relation to the defendant.

" 2. If you should find from the testimony that the night freight train in question was usually made up and started from the place where it stood when the party having charge of the plaintiff attempted to go on board, and that the defendant company, its agents or servants, had, previous to and about that time, carried such passengers in this night train, to and from Madison, as went aboard of their own accord, or upon application to some person having charge of the train, collecting from such person the usual fare of passengers, and further find that the caboose on the night in question, and at the time the party having charge of the plaintiff went aboard, was open for passengers, you will be warranted in finding a verdict for plaintiff ; if you still further find the absence of negligence upon the part of said party in the care bestowed upon the boy, and the existence of negligence at the time upon the part of the employees of the defendant having charge of the train.

And I will here add, that unless you do find the existence of the facts to which I have above alluded, I hardly see how, in view of the evidence, you are to find a verdict for the plaintiff, unless you find that they went aboard by direction of an employee of the defendant, having authority to give such direction, without negligence on their part.

"3. If, previous to and upon the night in question, this train had been and was carrying passengers and receiving fare, and you should believe from all the facts and circumstances that the party, in consequence of it, went there to take it, they were neither tresspassers nor outlaws. And if they were conducting themselves in a prudent manner in attempting to get aboard the train, and the boy was injured in consequence of the want of ordinary skill and care upon the part of the employees of the defendant, the defendant is liable."

All of the instructions which the court refused to give, are framed upon the hypothesis, that, inasmuch as the proper officer of the railway company had ordered that no passenger should be carried on this particular train, therefore the employees of the company on such train could not possibly do any act or give any consent which would render the plaintiff a lawful passenger thereon, so as to entitle him to the rights and remedies of a passenger for the injury which he sustained; and that, to entitle him to such rights and remedies, it was absolutely necessary that he should have express permission from some officer of the company, authorized to grant the same, to travel by that train.

Is this a correct hypothesis, when applied to the facts of this case? In the consideration of this question, there are certain undisputed facts which must be remembered. Among these, are, 1st. A portion of the freight trains running on the defendant's railroad were authorized to carry passengers, and were, for all legal purposes, passenger trains. 2d. Howard, who was one of the persons who had charge of the plaintiff, supposed and believed that all freight trains on that road carried passen-

gers.  3d. There is no evidence that Mrs. Lucas, plaintiff's mother, knew or believed to the contrary.  4th. It is not claimed that the plaintiff, or any of the persons who were with him when he was injured, had any knowledge that the train in question did not carry passengers, or that the conductor was prohibited from allowing passengers to ride thereon.  It is very apparent from the evidence that none of the party suspected even that it was a train from which passengers were excluded by the rules and orders of the company.

Under these circumstances, is the plaintiff bound by the instruction to the conductor not to take passengers on the train, of which neither he, nor those who had charge of him had any knowledge whatever?  And, because of such instruction, was the plaintiff unlawfully on the platform of the caboose from which he was thrown by the sudden movement of the cars?  It seems to me that the correct answer to these questions is perfectly plain and obvious.

Before the defendant used any portion of its freight trains as passenger trains also, and while the functions of the two were kept entirely separate and distinct, the one being used for the carriage of passengers and the other exclusively for the transportation of merchandise, a person riding upon a freight train without express authority from some person competent to give it, would probably have been unlawfully on the train, and could not have successfully claimed and enforced the rights of a passenger against the defendant.  But since the defendant has authorized the carriage of passengers upon some of its freight trains, it seems very clear to my mind that a different rule must be applied.  I think that since the system of carrying passengers on freight trains was adopted by the defendant, a person who goes upon a freight train in good faith, supposing it to be also a train for carrying passengers, is entitled to all the rights and remedies of a passenger as against the company, at least until he is informed that he has mistaken the character of the train.

By making a portion of its freight trains lawful passenger trains, the defendant has, so far as the public is concerned, *apparently* given the conductors of all its freight trains authority to carry passengers; and if any such conductor has orders not to carry passengers on his train, they are or may be in the nature of secret instructions, limiting and restricting his apparent authority, and third persons are not bound by such instructions until informed thereof. This is a familiar principle of the law of agency, and no good reason is perceived why it may not be applicable here. There is testimony tending to show that a person about the train, and who appeared to exercise authority over it, directed the plaintiff and those with him to get on the train. It does not positively appear that this man was an employee of the defendant; yet so many facts and circumstances appear in the testimony, which tend to show that he was one of the employees on this train — perhaps the conductor who brought the train to Madison, that the jury would have been warranted in finding that he was such employee or conductor, had the question been submitted to them. Had the jury so found, and especially had they found that the person who gave the direction was one of the conductors of the train, then, upon the principle above stated, the defendant would have been bound by the direction, and the relation of the plaintiff as a passenger on the train would have been thereby established. This feature of the case was not distinctly presented to the jury in the instructions which were given, but is directly involved in some of the proposed instructions asked for on behalf of the defendant, and refused.

The law is, that the principal is liable to third persons " for the frauds, deceits, concealments, misrepresentations, torts, negligences, and other malfeasances and misfeances, and omissions of duty, of his agent, *in the course of his employment*, although the principal did not authorize, or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade the acts, or disapproved of them. Story on Agency, § 452. And

the learned author proceeds to give the reasons upon which the law is founded, as follows : " In all such cases the rule applies, *Respondeat superior;* and it is founded upon public policy and convenience; for in no other way could there be any safety to third persons in their dealings, either directly with the principal, or indirectly with him through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted ; and thereby, in effect, he warrants his fidelity and good conduct in all matters within the scope of his agency." The same rule applies to the relation of master and servant ; and if the person committing the wrongful act, was at the time in the relation of servant to his principal, he was acting *in the course of his employment,* and the principal is liable for the consequences of such act. *Philadelphia & Reading R. Co. v. Derby,* 14 How. (U. S.), 486.

The conductor of the train in question was the general agent of the defendant, for the purposes of operating that train. As between himself and his employer he had no authority to receive passengers upon it. Such want ·of authority, however, was not known to the plaintiff or those in charge of him. They knew that conductors of other freight trains were authorized to receive, and did receive, passengers on their trains; and believed, as they well might, that the conductor with whom they were about to take passage, had the same authority. Whatever the rule might be, were no freight trains of the defendant permitted to carry passengers, it must be held, under the circumstances of this case, that if such conductor directed the plaintiff to go on board of the train, and the plaintiff did so, he thereby became a passenger of the defendant, notwithstanding the conductor exceeded his authority. In other words, such direction, if given, was within the scope of the conductor's employment, and binding upon the defendant, although unauthorized.

The case of *Dunn v. The Grand Trunk R. Co.,* 58 Me., 187, strongly illustrates and enforces some of the views above ex-

pressed. The company had given due notice that passengers would not be allowed to travel by freight trains on a specified portion of its line. Dunn entered the saloon car on a freight train on the prohibited part of the line. The testimony tends to show that the conductor informed him that he had no right to take passengers on his train, but on this point the testimony was conflicting. The report does not show conclusively whether Dunn was ignorant of the regulation or otherwise. The conductor received from Dunn the usual fare, and allowed him to remain on the train. During the trip, Dunn was injured by the alleged negligence of the company or its employees, and brought the action to recover damages therefor. It was held that he was lawfully on the train, and that the company was liable for such injuries, the same as though Dunn had been on a regular passenger train of the company. The opinion by APPLETON, C. J., contains a very able discussion of the principles involved in the case, and references to many authorities bearing upon and illustrating those principles, and will repay a careful perusal. The case may also be found in 10 Am. Law Reg. (N. S.), 615.

Our attention has been specially called to a review of that case by Judge REDFIELD, and published with the case in the Law Register (p. 624), wherein the writer seems to dissent from the conclusion of the supreme court of Maine. This review has been read with the care and attention to which every production from the pen of that eminent jurist is entitled. The principle which Judge REDFIELD thinks has been violated by the decision of the Maine court, is thus stated by him : " Every one is presumed to have notice that railways do not carry passengers upon their ordinary freight trains, and that if one is allowed to pass upon them as a passenger, it is conceded as a favor, and subject to the implied condition that he will incur the additional risk and inconvenience incident to that mode of transportation." This principle may be a correct one when applied to a case where the railway com-

pany does not permit passengers to travel on any of its freight trains; and it is very evident that the learned writer was only stating the principle as applicable to such a case. In the case which he was reviewing, the prohibition against carrying passengers on freight trains over the specified portion of the line, was total — extending to *all* freight trains. In *Elkins v. Boston and Maine R. R. Co*, 3 Foster, 275, which was an action for loss of goods shipped on a passenger train, it was held that the evidence failed to show that the railroad company had so conducted its business as to render itself liable as a common carrier of merchandise by its passenger trains; and in *Murch v. The Concord R. R. Co.*, 29 N. H. (9 Foster), 9, which was an action for injuries to the plaintiff received by him when riding upon a freight train, it was held that the evidence failed to show that the company had so conducted its business as to render itself liable as a carrier of passengers on its freight trains. These are the only cases cited by Judge REDFIELD to sustain the principle above quoted; and it is fairly to be inferred from the language of the court, that had those companies habitually carried freight upon their passenger trains, or passengers upon their freight trains, a different rule would have been applicable. Indeed Judge REDFIELD says in the same review : " If railway companies run passenger cars upon their freight trains, or *in any other mode* invite passengers to accept passage upon them, the company are bound to the same degree of responsibility as if they carried them in regular passenger trains." Where the fact exists, that a railway company does habitually carry passengers upon very many of its regular and ordinary freight trains, and a person takes passage upon a freight train, believing it to be one on which passengers are carried, and he is not informed to the contrary, but, perhaps, is directed by the conductor to go upon the train, and there is nothing in the condition or situation of the train which shows that passengers are not carried upon it, as well as upon other trains of like character, in such a case I do not think Judge

REDFIELD has said or would say that "every one is presumed to have notice that railways do not carry passengers upon their ordinary freight trains."

Some stress is placed upon the facts, that this particular train, upon which the plaintiff attempted to take passage, had no conveniences for carrying passengers; that it did not come to the passenger landing; and that the ticket office was not open for the sale of tickets to passengers during the usual time before the train left the station; and it seems to be claimed that these circumstances operated as a sort of notice that the same was not one of the defendant's freight trains upon which passengers might lawfully travel. The answer to this is, that neither the plaintiff nor the persons who had charge of him knew, at the time the plaintiff was hurt, whether the caboose had or had not conveniences for passengers. They had not then entered the caboose, and, in the darkness of the night and the hurry of getting on the train, it is fair to presume that they had no opportunity to examine its external appearance, conceding that its external appearance indicated that it was not adapted to the carrying of passengers. Further, it does not appear that the ticket office at the station was opened for those freight trains which received passengers, or that such trains came to the passenger platforms or landings, or that the external appearance of the caboose indicated that it was not adapted to the carrying of passengers. It appears affirmatively that the ticket office was opened only before the leaving of passenger trains, and that the same number of men were employed upon each freight train on the road, whether it was a train which carried passengers or one which did not. Considering these circumstances, and the further one that the plaintiff and the persons in charge of him were directed to go on board of the train by some person who, as they had good reason to believe, had authority over the train, there seems to be no foundation for the position that there was anything in the appearance or location of the train, or in any of the surrounding

circumstances, sufficient to charge the plaintiff and those with him, with notice that passengers were not carried on that train as well as on other freight trains of the defendant.

If the foregoing views are correct, it necessarily follows that all the proposed instructions are based upon an incorrect hypothesis, and hence that the court properly refused to give them to the jury.

Let us now briefly examine the instructions which were given to the jury. The doctrine of these is, that although the train in question was not one of the freight trains on which passengers were carried, and although the conductors thereof had express orders from the defendant not to take passengers thereon, yet if passengers were habitually, or perhaps occasionally, carried on such train without objection, and fare collected of them by the conductors, and if the caboose was open for passengers on the night that the plaintiff was injured, and the plaintiff and the party with him went upon the train because passengers had before been carried upon it, or because some employee of the defendant, having authority to do so, directed them to go upon the train, the relation of passenger and carrier existed between the parties.

No discussion of this doctrine is required here. It is quite sufficient to say that there is nothing in it, or in the instructions predicated upon it, of which the defendant can justly complain. Some portions of these instructions, considered without reference to the particular facts of the case, may be, and probably are, liable to criticism. For example, did the plaintiff's right to recover depend upon showing that the train upon which he was attempting to travel when injured, was a passenger train, because passengers had previously been permitted to travel upon it, it would not be sufficient, I think, to show that the conductor permitted persons to ride on it on two or three occasions only; but the proof should show that the train carried passengers habitually or frequently, or its character as a lawful passenger train would not be established. But it is not per-

ceived how this error (if it be one), or any other error in the instructions given (if any others have intervened), can possibly prejudice the defendant.

Had the court instructed the jury that if they found from the evidence that the persons in charge of the plaintiff believed, when they put the plaintiff on the train, that the same was one of the freight trains of the defendant which was authorized to carry passengers, and that they were not informed to the contrary before the plaintiff was injured, then the plaintiff was a passenger of the defendant, and entitled to the rights and remedies of a passenger, such instruction would have been unobjectionable, provided the views which I have expressed as to the law of the case are correct. Indeed, considering the undisputed facts in the case, it is very probable that the court might properly have instructed the jury, that at the time the plaintiff was injured the uncontroverted testimony proved that he was a passenger of the defendant. Either of the instructions here indicated would certainly have been less favorable to the defendant than those which were given. Hence there was no error in the instructions which the court gave the jury, which will work a reversal of the judgment.

Three exceptions to the rulings of the court or objections to the admission of testimony, are claimed to be well taken. 1. The counsel for the defendant asked the conductor of the train in question, who was a witness, what were his orders relative to carrying passengers on that train. The court sustained an objection to the proposed testimony. This was error. The testimony was clearly admissible; for the trial might have developed a state of facts which would have rendered the testimony very important. Subsequently, however, Mr. Atkins, the superintendent of the defendant's railway, was permitted to testify that the conductor had orders not to take passengers on that train. This testimony was entirely undisputed, and the fact that such were the conductor's orders is a verity in the case. Of course the defendant can not be injured because the con-

ductor also was not allowed to testify to the same fact. 2. The court permitted Conner Howard to testify to certain conversations with the person supposed to be connected with the train, and who directed the party to get on board of the train. I think this testimony was competent; and, had the exigencies of the case required it, the same was sufficient to justify the court in submitting it to the jury to find whether such person was an employee on the train. 3. It is said the court erred in permitting the witnesses Green and Miss Teed to testify that a short time before the plaintiff was injured, they traveled short distances on this train and paid fare to the conductor. This class of testimony was perhaps competent, as tending to prove that the train in question was a passenger train. The difficulty seems to be that there was not enough of it to establish the fact. But, if it was improperly admitted, it could not possibly have resulted in any injury to the defendant.

In any view which I have been able to take of the case, I am impelled to the conclusion that the judgment of the circuit court must be affirmed.

*By the Court.* — Judgment affirmed.

A motion for a rehearing was argued at length by *J. P. C. Cottrill* in behalf of the appellant, but was denied at the June term, 1873. The following remarks upon the case were subsequently prepared by Chief Justice DIXON.

DIXON, C. J. I was not present at the argument of this cause, am not familiar with the facts, and do not wish to be understood as expressing any positive opinion upon the very important questions involved in it. I have examined the questions sufficiently to discover, as I think, their very great importance both to the railway companies and to the community at large, and also to raise in my own mind very serious doubts as to the correctness of the conclusions arrived at by my learned associates. If I had been in my place on the bench

Lucas vs. The Milwaukee & St. Paul Railway Company.

when the cause was argued, and so obliged to express an opinion in it, I should of course have given the questions the study and reflection necessary for that purpose, and then, if unable to concur in the judgment pronounced by the majority of the court, it would have become my duty to express my dissent. As it is, I desire merely to reserve my judgment, and incidentally to make some observations indicating the nature and importance of the questions, and the views which have been heretofore taken by others whose opinions are entitled to the greatest respect.

It is a question of much moment and gravity, whether, as our railways are managed, the conductor of a freight train can, by virtue of his general employment, and in the absence of special authority expressly given, or of some usage or custom known to the company or its officers and therefore sanctioned by the company, receive upon his train a person to be carried for fare or otherwise, and bind the company for the safe and careful conveyance of such person as the carrier of a passenger, or as if such person had been received on board one of its regular passenger trains. It is a serious question whether the reception thus, by a freight conductor, of a person on board his train is an act within the scope of his employment or authority, which in any respect binds the company, and whether the relation of carrier and passenger can be said to exist at all between the company and such person. It is the assertion of a very broad, and, as it seems to me, almost untenable proposition, to say in such case that the freight conductor can charge the company with the obligations and responsibilities which attach to common carriers of passengers by railway. It is well known that the law, for the protection of travelers, subjects such carriers to a very strict responsibility, and imposes upon them the duty of providing for the safe transportation of passengers, so far as that is practicable by the exercise of human care and foresight. The duty thus imposed requires the carrier to see that the road is in good condition, the

engines properly constructed and equipped, the cars strong and suited to the accommodation of passengers, and all the machinery and running gear in perfect order and of the best workmanship, so far as the closest scrutiny can detect. And every body knows, or ought to know, how this duty is performed or the performance attempted by the carrier, namely, that cars are constructed and trains made up and run especially for the conveyance of passengers; that time tables are made and advertised for the information and convenience of the traveling public; and that conductors are selected, and control of such trains given to them, with particular reference to their care, skill, ability and experience to properly manage that branch of the employer's business. Every body knows, or, as it seems to me, ought to know, the difference between a freight train and a passenger train, and that conductors of the former are not, as a general rule, or even exceptionally unless in very rare instances, authorized by the company to receive and carry passengers. There is nothing in the nature of their employment or the service in which they are engaged, to indicate any such authority, and the company does not hold them out as having it. How, then, is it that a person taking passage with one of these freight conductors, who, he knows, is not employed for any such purpose, is not to be affected with notice of the conductor's want of authority to bind the company as carrier of a passenger? How is it that he can hold the company responsible for the consequences of the insufficiency of machinery or equipments, or of the negligence or want of skill on the part of servants, when he knows that neither the machinery nor the servants are in anywise employed by the company in that particular branch of business? I must confess to being very dull and slow to comprehend how these things can be, and am only consoled with the reflection that others who are wise and ought to be able to see, have been equally dull and slow with myself. I find the supreme court of New Hampshire, after full argument and deliberation in at least two cases, to have

remained as blind and impervious to the light as I am, and to have held that the company would not be responsible for the safety of the passenger under such circumstances. *Elkins v. Boston & Maine Railroad Co.*, 3 Foster, 275 ; *Murch v. Concord Railroad Co.*, 9 id., 9.

And the same are the views expressed by Judge REDFIELD, in his remarks upon the case of *Dunn v. Grand Trunk Railway Co.*, 10 Am. Law. Reg., N. S., 624, 625.   He says : " But as we understand the settled law upon the subject, in regard to the passenger transportation upon freight trains, the rule of implication, as against the companies, resulting from the acts, declarations and acquiescence of conductors, is entirely different, we might say the reverse, from what it is upon passenger trains.   Upon the freight trains of a railway, the conductors have no implied authority to bind the company by allowing persons to be carried as passengers.   Every one is presumed to have notice that railway companies do not carry passengers upon their ordinary freight trains, and that if one is allowed to pass upon them as a passenger, it is conceded as a favor, and subject to the implied condition that they will incur the additional risk and inconvenience necessarily incident to that mode of transportation.   This rule has been often declared and is recognized in the principal case, as well as in many others."

It really seems to me there would be as much propriety in holding the company responsible as a common carrier of passengers, if a person were to take passage on a coal or wood train, employed in the transportation of those articles for the use of the company, or on a construction or gravel train, as in holding it so responsible where the passage is by an ordinary freight train.   I cannot discover the difference, and in either case think the rule applicable which was held in *Shoemaker v. Kingsbury*, 12 Wallace, 369.   And upon this point I rely also, to some extent, on the case of *Gleason v. Goodrich Transportation Co.*, 32 Wis., pp. 85, 94, 95 and 96, and authorities there cited.

The next point upon which I wish to reserve my judgment,

or, as I perhaps should say, respecting which I desire to protest, is that of contributory negligence leading to the painful accident which was the cause of the present litigation. There are a great many very careless and stupid people in the world, multitudes of nervous, fidgety and excitable ones, and those who are extraordinarily ignorant; and, fortunately or unfortunately for these railway companies, such people do not stay at home any more than others, and the companies are constantly brought in contact and have to deal with them in their capacity of travelers by the railroads. It is surely enough for the companies, or their agents and servants, to be obliged to submit with patience and good nature to the annoyances, caused by the excitability, restlessness and stupidity of such people, and to exercise due care and watchfulness that no injury may happen to them through fault of the companies, without at the same time being held responsible for all the consequences of the carelessness and gross blunders of that kind of travelers. There is always more or less bustle and confusion attending the arrival and departure of trains, especially at the larger or principal stations, and that is just the time when people of this sort seem to know the least, or to exercise the least common sense. It would require an army of the most active and vigilant servants on the part of the company, under such circumstances, always to keep such persons out of mischief, or to prevent their doing something to hurt or destroy themselves. I protest against any rule which may or ordinally will, in the discretion of a jury, make the company responsible for injuries thus happening through the negligence, inattention or stupidity of the traveler. As already observed, I am not very familiar with the facts of this case, but so far as I understand them there seems to me to be strong reason for saying that there was great want of care and attention on the part of the plaintiff, or on the part of his mother and the other adult persons in whose charge he was, in approaching the train and attempting to board the cars at the time and in the manner

they did.   It was a freight train, and one not designed for the reception or carriage of passengers at all.   It was drawn up in the company's yard, at a place distant from the platform where passengers are accustomed to enter and depart from the cars, and, as I understand, on the opposite side of the station house from the platform.   It was near the middle of the night, when it was quite dark, and where there were no lights except the conductor's lantern and others used on the train, so that it was very difficult, if not impossible, for the conductor or brakemen in charge of the train to observe the movements of the plaintiff and his friends in trying to get aboard the car, or to warn them to desist.   Now if it had been a mixed or accommodation train, as they are called, and so intended for the transportation of both passengers and freight, I very much doubt even then whether the plaintiff and his friends would have been justified in attempting to enter the car in the way they did.   The most ordinary prudence and sagacity, it seems to me, would have dictated that they should pause until permission to enter was obtained from the conductor or brakeman, or until they were invited to do so by one or the other.   The fact, if it had been so, that it was a mixed train, would not have authorized persons awaiting passage to rush pell-mell for the platform or entrance of the car the moment the train came to a halt.   It would have been, to say the least, an act of gross heedlessness and inattention to do so, and the inclination of my mind, so far as I am informed or capable of judging, is that such was the character of the act of the plaintiff and his mother and others with him in endeavoring to enter the car on the occasion spoken of.

Still another proposition to which I do not wish to be understood as giving my assent, is, that these railway companies may not run one or more of those mixed or accommodation trains over their roads, without at the same time holding themselves out as carriers of passengers by all their trains, or holding out the conductor of every freight train as having authority to receive

and carry passengers. The mixed or accommodation train, running for short distances and at odd times, is frequently of the greatest convenience and advantage to the traveling public. I insist that the companies may in this way accommodate and benefit the public, whose servants they are, without at the same time making themselves responsible in damages for the life or limbs of every fool-hardy, stupid or inconsiderate man, woman or child, who may, in daylight or darkness, and without regard to surrounding facts and circumstances, hurry blindly up and attempt to climb aboard any mere freight train which chances to arrive and stop at the depot. And I insist that the companies may do this notwithstanding the " caboose," which is a car necessarily attached to almost every freight train, and intended solely for the accommodation of the men connected with the train, containing their bunks, mattresses and seats on which to sleep and sit, and tables on which to eat, and in which also are deposited the lamps of the cars and the tools used by the men, may have something the same appearance externally of the passenger car attached and used as part of the mixed or accommodation train. All that is required is the possession of a little common sense and the exercise of a small degree of caution on the part of the traveler to prevent any mistake, confusion or accident in such cases.

With these observations of a general nature upon the questions presented or suggested by the case, I am content to let it go as my brethren have decided it. As remarked at the outset, I am not sufficiently familiar with the facts (and I have written this with no printed case before me, and without ever having read it), to venture any positive opinion one way or the other; and therefore I have felt obliged, and for such reasons as are imperfectly above stated, to withold my judgment in the case.