HENSEL, Respondent, vs. HENSEL YELLOW CAB COMPANY, INC., Appellant.

*May 9—November 12, 1932.*

492

For the appellant there was a brief by *Bender, Trump, McIntyre & Freeman* of Milwaukee, and oral argument by *Rodger M. Trump.*

For the respondent there was a brief by *Buchen & Schlichting* of Sheboygan, and oral argument by *G. W. Buchen.*

Rosenberry, C. J. The first contention made by the defendant is that there is no evidence to justify the jury's finding of negligence with respect to lookout, management, and control. In its instructions to the jury the court made no reference to the fact that the plaintiff was a guest either of her husband or of the company. The instructions given in regard to the first question of the special verdict relate to ordinary negligence and are in no way qualified. The defendant requested no instructions upon these points, and it is apparent from the record counsel considered and so informed the court that the contributory negligence of the plaintiff and assumption of risk by her were matters of law for the court. This is not a satisfactory way to dispose of questions of this kind when properly raised upon the trial.

Since *Cleary v. Eckart* (1926), 191 Wis. 114, 210 N. W. 267, this court has repeatedly emphasized the fact that the duty of a host to his guest is materially different than the duty of one to a third person. It is well established that a guest must accept the premises of his host as he finds them, it being the duty of the host to warn the guest of lurking dangers, so a guest accepts the automobile of his host as it is unless there are defects known to the host not observable by the guest in the exercise of ordinary care; in other words, unless there are lurking dangers. *O'Shea v. Lavoy* (1921), 175 Wis. 456, 185 N. W. 525.

In *Cleary v. Eckart, supra,* it was held that the fundamental relation existing between host and guest is that of licensor and licensee and that the duty which the host owes to his guest is that of a licensor to a licensee.

In *Poneitowcki v. Harres,* 200 Wis. 504, 228 N. W. 126, the situation was very similar to that disclosed by the record in this case. The court there said:

"But even though the verdict was not so framed as to attract the attention of the jury to the qualified care which the relations obtaining imposed upon the appellant (host), it may or may not constitute prejudicial error as submitted

to the jury. They were asked to find whether the appellant failed to exercise ordinary care under the circumstances, and no distinction was made between the degree of care which he (host) owed to the respondent (guest) and to all the world, and especially other users of the highway. However, if there be no difference in the instant case, in the duty which the appellant owed to the respondent and the duty which he owed to other users of the highway, then the form of the verdict should not be deemed prejudicial error.

"While the guest cannot demand of the host a higher degree of skill and experience than he actually possesses, in the management and control of the automobile under special and peculiar circumstances, even though they do not amount to emergencies, nevertheless there are certain duties imposed upon the drivers of automobiles, the abilities to perform which do not depend upon experience or acquired skill. Among these is the duty to maintain a reasonable speed, obey the law of the road, keep a proper lookout, etc. There are duties which are required to be observed for the safety of every one—those within as well as those without the automobile,—and failure to perform them may result in liability in the absence of acquiescence or contributory negligence on the part of the guest. The driver of an automobile who maintains an excessive or reckless speed, who fails to maintain a lookout or to observe the laws of the road, plainly increases the dangers which the guest assumed upon entering the automobile and adds new ones, and there manifestly is no difference between the degree of care he is required to use in these respects for the safety of his guests and for the safety of other persons."

In that case it was held that the evidence being sufficient to sustain the findings with respect to excessive speed and the failure to maintain a proper lookout, the verdict sustained the judgment.

In this case if we assume that the failure of Fred Hensel properly to control and manage the truck was due to a lack of skill on his part and not to inadvertence and that that was a hazard assumed by the plaintiff (see *Harter v. Dickman, ante,* p. 283, 245 N. W. 157), there still remains the finding that he was negligent with respect to lookout, as to

which he owed the plaintiff the same duty as he owed others, in the absence of evidence that he was habitually negligent as to lookout to the knowledge of the plaintiff and in the absence of any conduct on her part inducing or acquiescing in his conduct as to lookout at the immediate time. This brings us to the question of whether or not there is credible evidence which sustains the jury's finding of failure to exercise ordinary care in that respect. There is very little dispute upon the facts. Differences arise, however, with respect to the inferences which may properly be drawn from those facts. Under the well established rule, if the minds of reasonable men may come to different conclusions with respect to these inferences the question is for the jury. What Fred Hensel saw when he reached the top of the hill in question is disclosed in two ways: (1st) by what he said he saw, and (2d) by what he did: He testified:

"When I got to the top of the hill where the accident happened there was a slight rise in that. I shifted at first. Just before I shifted I naturally had to slow up the truck. I got her down to between eight and ten miles an hour. I shifted from the fourth to the third. After we came down that small rise, then that big one loomed up; of course, it was all part of that hill but I didn't see it from the first part. I tried to shift further then, when I saw the big incline. I don't know if I succeeded in making that shift, I was so unstrung. . . . Immediately after going over the rise I saw that the hill was so steep that I would have to shift as low as possible and that is what I attempted to do, and how far down I really don't know. . . . It is a fact that when I was going down I saw this first grade, and then the second grade was a good deal steeper than the first grade. I didn't realize that at first. I realized that as I came up above the rise."

It is evident that what Hensel meant by small rise was a hump in the hill.

It appears from his testimony that on several other occasions he had negotiated hills by shifting to third, second, or even first speed, and had safely descended other hills in that way on this trip. It appears without dispute that at the

point where the truck overturned there was a sharp curve in the road. The testimony is not clear as to whether or not the turn might have been observed from the top of the hill. There is no evidence that Hensel observed it at any time prior to the time when the truck became unmanageable. According to the testimony of one Wilsnack, who drove the other Hensel truck which preceded the one driven by Fred Hensel, the hill was about four blocks long, the turn about midway, and the hill is steep both above and below the point of the accident.

The accident may have been caused by one of three things: (1st) the failure of Hensel to make a reasonably careful and accurate observation (maintain a proper lookout); (2d) carelessness or inadvertence on his part in forming a conclusion as to what should be done under the circumstances; and (3d) that the driver Hensel was not possessed of sufficient skill and judgment to meet the situation and that the accident was due to a want of skill on his part. There is nothing to indicate that the driver Hensel did not exercise such skill as he possessed in the management of the truck. He had every inducement to do so. His own safety as well as that of his wife and employee were at stake as well as the property of the company. It is quite clear that had he in the first instance realized the steepness of the hill and the fact that there was a turn midway in the hill, he would in all probability have shifted to second or first speed instead of to third. It appears that he is a driver of thirteen or fourteen years' experience in the management and control of trucks on strange highways.

It is considered that the circumstances are such that a jury might reasonably find from the evidence that the failure of the driver Hensel to meet the situation was due to his failure to make a reasonably careful and accurate observation; in other words, to maintain a proper lookout. In this case as in *Poneitowcki v. Harres, supra,* Hensel owed the same duty to the plaintiff in respect to lookout, in the absence of evi-

dence of the nature above noted, that he owed to any third person, and his failure to use ordinary care in the performance of that duty constituted negligence for which the defendant is liable. The failure of the court to instruct the jury with reference to the host-guest relationship was not prejudicial error for the reason stated in *Poneitowcki v. Harres, supra.* The failure of the driver Hensel to maintain a proper lookout increased the danger and added a new hazard neither of which was assumed by the plaintiff.

It is next contended that the defendant corporation is not liable because it was not within its corporate power to engage in the business of the gratuitous carriage of persons. It is argued that the act of carriage being *ultra vires,* the defendant should not be held liable for the negligent acts of its servants. The cases of *Seidl v. Knop,* 174 Wis. 397, 182 N. W. 980, and *Miller v. Frank I. Epstein Co.* 185 Wis. 112, 200 N. W. 645, were cited in support of this contention. In these cases the master was held not liable because at the time of the injury complained of the servant was not engaged in the master's business. Here at the time the injuries complained of occurred the servant was admittedly engaged in the master's business. Hensel had not departed from the ordinary and customary route of travel between Sheboygan and Philadelphia for the purpose of performing some act outside of or beyond the scope of his employment, but while performing an act clearly within the scope of his employment he performed it so negligently as to cause the plaintiff injury. The doctrine of *ultra vires* is not one to be set up by a corporation as a shield against liability for corporate acts, but it is a weapon to be used by the state to keep private corporations within their legitimate spheres and to punish them for violation of their corporate charters.

As was said by a learned writer:

"Corporations are responsible for the wrongs committed or authorized by them, under substantially the same rules

which govern the responsibility of natural persons. It was formerly supposed that those torts which involved the element of evil intent, such as batteries, libels, and the like, could not be committed by corporations, inasmuch as the state, in granting rights for lawful purposes, had conferred no power to commit unlawful acts; and such torts, committed by corporate agents, must consequently be *ultra vires,* and the individual wrongs of the agents themselves. But this idea no longer obtains. . . . But many torts are unintentional, and arise through neglect of agents and servants, while others, though intentional, are committed by agents or servants in the supposed interest of their employers, and under circumstances which may justify them in believing that what they do is fairly authorized, and a part of their duty under their employment. To deny redress against the corporation would in many cases be a denial of all remedy. The rule is now well settled that, while keeping within the apparent scope of corporate powers, corporations have a general capacity to render themselves liable for torts, except for those where the tort consists in the breach of some duty which from its nature could not be imposed upon or discharged by a corporation." 1 Cooley, Torts (4th ed.) § 70 and cases cited. See, also, 7 Thompson, Corporations (3d ed.) p. 306, § 5415.

It was clearly within the power of the corporation to create as between itself and the plaintiff the relationship of licensor and licensee. Even if it were not, the corporation could not set up the doctrine of *ultra vires* to escape liability under the circumstances of this case. *Zinc Carbonate Co. v. First Nat. Bank,* 103 Wis. 125, 79 N. W. 229.

But it is said that the acts of Fred Hensel, president of the company, and Arthur Hensel, the vice-president of the company, were ineffectual to create the relationship of host and guest between the plaintiff and defendant because Hensel as driver of the truck was acting beyond the scope of his real or apparent authority in inviting or permitting the plaintiff to ride upon the truck. The determination of this question requires us to examine the nature of the relationship of

licensor and licensee. There runs through the brief of counsel the idea that there is something of a contractual nature inherent in the relationship of licensor and licensee. That the relation may be created by contract there can be no doubt. The law of licensor and licensee as applied to automotive vehicles is derived from the law of real property. The one essential of a license is that it be assented to by the licensor and this assent may be evidenced by conduct as well as by writings. It has been held from the earliest times in this state that where persons habitually traverse the right of way of railway companies to the knowledge of the company that any person so traveling upon the right of way is a licensee although he may be there in violation of a statute and without the express consent of the defendant company. *Davis v. Chicago & N. W. R. Co.* 58 Wis. 646, 17 N. W. 406.

Where a person is upon the property of another with the other's knowledge, that is sufficient to establish the relationship. In *Muench v. Heinemann,* 119 Wis. 441, 96 N. W. 800, the court said:

"In the present case it appears without dispute that the plaintiff went upon the premises for the transaction of private business of his own with the defendants' employees, in which the defendants themselves had no interest, and up to the time, at least, when the defendant Jenner (an employee of the defendant), as alleged and found, directed him to use the west elevator, he was a mere licensee; and the simple question presented is whether that direction constituted an invitation, either express or implied."

In order to establish the relationship of licensor and licensee between the defendant company and the plaintiff it is not necessary to show that the officers of the company had authority to extend an invitation to the plaintiff. If they had such authority and the invitation had been extended and accepted, the relationship would have been that of invitor and invitee, which imposes upon the invitor a higher duty to exercise care for the safety of the invitee than the law re-

quires of a licensor to exercise as to a licensee. *Muench v. Heinemann, supra.* We may therefore put to one side any consideration with respect to the scope of the authority of Fred Hensel or Arthur Hensel and we need consider only whether or not the plaintiff was upon the truck with the knowledge and acquiescence of the company. If she was, she was a licensee and the defendant company owed to her the duty owing by a licensor to a licensee. We are not required to find any contractual element in the relationship nor to find any authority, express or implied, to extend an invitation. We only need to find that the company had knowledge of her presence upon the truck and acquiesced therein.

At all times while upon the trip Fred Hensel was engaged in the business of the company. Whatever knowledge he gained or should have gained in the course of the transaction of the company's business was knowledge of the company. If a detour sign in the highway had come to his notice, the company would have had knowledge of that sign; so of any other fact relevant or material to the company's business. It is difficult to argue a proposition which seems so manifest as that the company had notice of the presence of the plaintiff upon the truck when she sat on the seat beside the president of the company and was handed a pillow for use on the trip by the vice-president of the company. Can there be any doubt that if a person had climbed upon the truck without invitation while it was upon its way and his presence was known to the driver, Hensel, that thereafter the legal relation of the company and the rider would have been affected? See 20 Ruling Case Law, p. 83, § 73 and cases cited. If so, how can it be said that the relation between the company and the plaintiff, who was upon the truck with the full knowledge and acquiescence of its managing officers, was not affected and that the acquiescence of the officers in her presence upon the truck was not in fact the acquiescence of the corporation. It is not necessary to point out that the corpo-

ration can act only through its officers and agents. Conceding that plaintiff was there for purposes of her own, that she was on a pleasure trip at the invitation of her husband, that her presence there did not further the business of the company, nevertheless the company had full knowledge of her presence, and under all of the authorities under such circumstances the defendant company owed to her the duty that a licensor owes to a licensee. See note 14 A. L. R. 145 and cases cited. Even if the plaintiff was a trespasser, the defendant owed her the duty of refraining from "active" negligence. *Brinilson v. Chicago & N. W. R. Co.* 144 Wis. 614, 129 N. W. 664. See 49 A. L. R. 783 and cases cited. The defendant owed to the plaintiff the duty to not increase the danger nor to add a new hazard while she was upon the truck with the knowledge and acquiescence of defendant's principal officers.

It is next urged that in the state of Ohio, in which jurisdiction this cause of action arose and by the laws of which it must be governed, a wife may not sue her husband for a tort committed upon her by him. *Leonardi v. Leonardi,* 21 Ohio App. 110, 153 N. E. 93. Counsel agree that whether or not a married woman may nevertheless sue her husband's employer for injuries sustained by reason of her husband's negligence, has never been decided in the state of Ohio.

In other jurisdictions there are five cases involving the question of whether a wife may sue her husband's employer under the circumstances disclosed by the facts of this case. Three cases—*Maine v. James Maine & Sons Co.* 198 Iowa, 1278, 201 N. W. 20; *Riser v. Riser,* 240 Mich. 402, 215 N. W. 290; and *Emerson v. Western Seed & Irr. Co.* 116 Neb. 180, 216 N. W. 297—hold that she may not maintain such an action. To the contrary are the following cases: *Schubert v. August Schubert Wagon Co.* 249 N. Y. 253,

164 N. E. 42, and *Poulin v. Graham,* 102 Vt. 307, 147 Atl. 698.

In *Chase v. New Haven Waste Material Corp.* 111 Conn. 377, 150 Atl. 107, 68 A. L. R. 1497, it was held that an employer was liable to an unemancipated minor child of an employee for an injury due to the employee's negligence while acting in the service of the employer, notwithstanding that the child could not maintain an action against the parent for the tortious act.

In Wisconsin a wife may by reason of the provisions of the statute maintain an action against her husband for damages due to his wrongful act. *Wait v. Pierce,* 191 Wis. 202, 209 N. W. 475, 210 N. W. 822. On the other hand, a child may not maintain an action against its parent under like circumstances. *Wick v. Wick,* 192 Wis. 260, 212 N. W. 787.

The theory of the cases in the states where recovery is denied under such circumstances rests upon the proposition that a master's liability is derivative, that is, based upon the servant's liability. *Maine v. James Maine & Sons Co., supra.* As pointed out in *Schubert v. August Schubert Wagon Co., supra,* the wrongful act of the husband toward his wife does not cease to be wrongful merely because the wife may not recover damages. The court said:

"Others may not hide behind the skirts of his immunity. . . . The employer must answer for the damage, whether there is trespass by direct command, or trespass incidental to the business committed to the servant's keeping. In each case the maxim governs that he who acts through another acts by himself."

In *Chase v. New Haven Waste Material Corp., supra,* the court said:

"Public policy may exempt the husband or parent from an action by the wife or child directly against him for his negligent act. There is no rule of law and no public policy

which would exempt the employer, The two actions are totally dissimilar, as we have earlier stated. The argument rests upon the fallacious assumption that since the employer has an action over against his employee, it will merely result in the employee paying back to him the recovery from the employer, less the expenses of the litigation. The recovery for the wrong done the wife or child by the employer does not belong to the husband or father, but to the wife or child. The recovery by the employer from his employee will diminish his own property; it will not in the eye of the law diminish the property belonging to his wife or child. The assumption is also fallacious in that it assumes there will be an actual recovery in fact against the employee. . . . We find no difference in principle, in cases of the kind we are considering, between the action by the wife, who is permitted by statute to sue in tort her husband, and the action by the unemancipated child who is denied the right to sue his parent for his tortious act."

It is considered that when the supreme court of the state of Ohio is called upon to decide this question it will, in accordance with what appears to us to be the sounder reasoning, declare the law to be that the employer is liable under the circumstances of this case.

*By the Court.*—Judgment affirmed.

OWEN, J. (*dissenting*). I think the judgment in this case should be reversed (1) because the defendant corporation owed no duty to the plaintiff, and (2) if it did owe a duty there was no breach thereof.

The case was tried on the theory that Mrs. Hensel was the guest of the defendant corporation. If an insensate and soulless corporation can be a party to the human and social relation of host and guest (to my mind an obvious incongruity), I am satisfied that no such relation existed here.

It happens that Mrs. Hensel's husband was president of the defendant corporation. It fell to him to assist in driving one of the defendant's moving vans loaded with household

goods from Sheboygan to Philadelphia. A short time before the trip was attempted, plaintiff's husband suggested to her that she go along on the trip. In other words, he extended to her an invitation to take the ride. In order that this invitation result in her becoming a guest of the corporation, it must appear that he extended the invitation in his official capacity as president of the company and not as her husband. There is no circumstance in the case from which it can be inferred that in extending the invitation he did so on behalf of the company. In the first place, it would be a very natural thing for a husband to invite his wife to accompany him on such a trip. In the second place, no interest of the company would be advanced by her taking the trip. According to her own testimony, she had never ridden in a moving van before, and she went on the trip merely for her personal pleasure. While it may be conceded that she went on the trip pursuant to the invitation of her husband, that invitation might have been extended either in his personal or official capacity. It is a natural invitation to be extended in his personal capacity and an unnatural invitation if extended in his official capacity. To enable him to extend such an invitation in his official capacity it was necessary, in order to bind the company, that he have authority so to do.

The company was not engaged in the business of carrying passengers. Neither was it within the scope of its corporate purposes to promote the pleasure of the families of its stockholders or officers. This is a material consideration in determining whether the husband as president of the company was acting within the scope of his authority if he assumed to extend the invitation on behalf of the company.

It is a familiar principle that where an agent or officer assumes to act for a corporation, in order to bind the corporation the agent or officer must be acting within the scope of his authority, and there are limits to the authority of an

officer of the company as well as the humblest agent of the company beyond which the officer of the company cannot go in the matter of binding the company.

There is no pretense here that there ever was any resolution of the board of directors, or any other action on the part of the corporation, which authorized the president to take his wife upon this trip as the guest of the company. Neither was there any custom or usage in that respect which could ripen into acquiescence under the doctrine finding expression in *Davis v. Chicago & N. W. R. Co.* 58 Wis. 646, 17 N. W. 406. Therefore if he assumed to do so—an unnatural and unlikely assumption,—he was acting outside the scope of his authority, and she did not, by virtue of such invitation, become the guest of the corporation. She was the guest of her husband, who simply made use of the company's equipment to furnish her entertainment and pleasure.

However, she might have been a licensee of the company even though she were not the guest of the company, and, as I understand, this is the attitude expressed in the majority opinion. Whether she was a licensee of the company justifies a careful consideration involving the application of well established legal principles to the situation.

It is said that she became the licensee of the company because her brother-in-law, who was also an officer of the company, knew that she was going on the trip, that he encouraged her so to do, and that his knowledge would be imputed to the company and become the knowledge of the company, so that she was on the trip with the knowledge, consent, and acquiescence of the company, in which event she was at least a licensee of the company. In the first place, the knowledge which the brother-in-law had was of the actual facts, which, as I construe them, were that the husband had invited the plaintiff to accompany him on the trip as his guest, using the equipment of the company under

his control and management for her entertainment. This it was of which he had knowledge. He had no knowledge that the husband had invited her as the guest of the company. More than that, the knowledge which came to him did not come to him while he was in the discharge of duties which he owed the company.

It is fundamental that the principal is not charged with all of the knowledge coming to its agent. The general rule is that notice to or knowledge of an agent, while acting within the scope of his authority and with respect of a matter in reference to which his authority extends, is notice to or knowledge of the principal. His knowledge, however, must be acquired while he is acting within the scope of his authority and in reference to a matter over which his authority extends (4 Fletcher, Cyc. Corp. § 2214; 2 Thompson, Corporations (2d ed.) § 1648 *et seq.*), and there is no evidence in this case to indicate that the knowledge which came to the brother-in-law came to him while acting officially and within the scope of his corporate duties.

It appears that it was understood on the part of Mrs. Hensel at least, three or four days before the trip started, that she was to accompany her husband on the trip. If this understanding came about as a result of family visits and conferences, those who thus acquired knowledge thereof did not acquire it while acting within the scope of their official duties. Knowledge which comes to an officer of a corporation, or any other agent, while on the street, or at a social dinner table, is not imputable to the corporation, or other principal. Such knowledge is not imputable to the principal unless it comes to the agent in a manner in which he would be likely to remember it and would be likely to communicate it to his principal.

The nature of the arrangement for the trip was such that neither the husband nor the brother-in-law was likely to

communicate it to the principal. So far as the husband was concerned, he was using the company's equipment for his own personal ends and in violation of the duty which he owed to the company. If his wife became the licensee of the company, it imposed upon the company very serious obligations and burdens. It put the property of every other stockholder of the company in jeopardy, which was something that could have been enjoined by a non-consenting stockholder. 5 Thompson, Corporations (2d ed.) § 5693. The circumstances were such that the husband was not likely to communicate the act he contemplated to the corporation, and, in view of the fact that his brother was condoning and encouraging the trip on the part of Mrs. Hensel, there is no reason to believe that he would have communicated it to the company. His interest in the matter, while perhaps sentimental, was not that of the company.

Cases are cited in a note in 14 A. L. R. 145, supporting the proposition that where the executive officers of a corporation permit the driver of a truck to give gratuitous rides, the company is chargeable with the failure of the driver to exercise ordinary care. I do not think the note, nor the cases cited in the note, authority for this proposition. A line of cases is cited in that note to the effect that the master will be liable for the gross negligence of his servant resulting in injury to one upon the truck without his authority. He is only responsible for failure to exercise ordinary care, however, where the passenger is upon the conveyance by permission of the servant where such permission is granted within the scope of the servant's employment, or within the apparent authority with which he has been clothed by his master.

The ostensible authority of the servant is important. But it is difficult to see where there is even any ostensible authority on the part of a servant driving a delivery truck, hauling

gravel or lumber, or driving a moving van, or even an automobile, to invite strangers or third persons to ride with him. What is there in such a situation to indicate to the invitee that the driver of the truck, in extending such an invitation, is acting within the scope of his employment? So far as I have examined the cases cited supporting the liability of the master upon the theory that the servant had ostensible authority to extend the invitation, they are all cases in which the master was a common carrier, whose business related to the carrying of passengers, and the very titles of the cases cited in the note indicate that they were against railroad companies or street-car companies. In such cases it is easy to spell out of the various situations ostensible authority on the part of the servant to extend an invitation to ride.

Thus, in *Wilton v. Middlesex R. Co.* 107 Mass. 108, it is held that a street-car company is liable to a person injured while riding, with due care, on the platform of a horse-car of the street railway corporation, not as a passenger for hire but by invitation of the driver and without collusion with him to defraud the corporation.

In *Rosenbaum v. St. Paul & D. R. Co.* 38 Minn. 173, 36 N. W. 447, it is held that the presumption that one who is permitted by an employee of a railroad company to ride upon a construction train is not lawfully thereon may be overcome by special circumstances implying the authority of such employee to grant such privilege.

In *Fitzgibbon v. Chicago & N. W. R. Co.* 119 Iowa, 261, 93 N. W. 276, it is held that where plaintiff went on a special excursion train, in good faith believing that the conductor knew he was not a member of the excursion but had a right to accept him as a passenger, and that the conductor did so accept him, the relation of carrier and passenger was established.

In *Lucas v. Milwaukee & St. P. R. Co.* 33 Wis. 41, it is held that the conductor of a freight train, under the circumstances of that case, had ostensible authority to permit a passenger to ride on his train.

In *Boehm v. Duluth, S. S. & A. R. Co.* 91 Wis. 592, 65 N. W. 506, it is held that the railroad company is liable to one who applies to the ticket agent for a ticket, saying that he wanted to go on the first train, whether it was a freight or passenger, and the agent told him that he could take a certain freight train, from which he was put off by the conductor because that particular freight train did not carry passengers.

It is apparent that cases of this kind, involving the apparent authority of servants performing duties in and about the carriage of passengers as a regular business, offer little analogy for determining the apparent scope of the authority of the drivers of trucks, delivery wagons, or even automobiles. There are many cases from many states holding that the master is not liable to one whom the driver of his automobile invites to ride unless the invitation of the servant is within the scope of his authority.

In *Rolfe v. Hewitt,* 227 N. Y. 486, 125 N. E. 804, 805, a chauffeur, contrary to the instructions of his master, invited another to ride with him. An accident happened and both were killed. The question of the liability of the master under such circumstances received the careful consideration of that able court. During the course of the opinion it is said:

"The rule is well settled that an agent binds his master only as to acts done within his actual authority, or within the apparent scope thereof. A servant is acting within the scope of his employment when he is engaged in doing for his master what he has been directed to do, or as Mechem on Agency (vol. 2, sec. 1875) says: 'Any act which can fairly and reasonably be deemed to be an ordinary and nat-

ural incident or attribute of that act, or a natural, direct, and logical result of it.' . . . When the owner of a private car sends his chauffeur on an errand, that does not give him authority to take into it a person casually met upon the highway."

It was held that the defendant was not liable. In that case it was held that the passenger was a licensee or guest of the chauffeur but not of the master.

In *Goldberg v. Borden's Condensed Milk Co.* 227 N. Y. 465, 125 N. E. 807, the driver of a milk wagon extended an invitation to a boy, whom he had frequently permitted to ride, to ride with him. The boy was injured. Held, in extending the invitation the driver of the milk wagon was acting outside the scope of his employment, and the defendant was not liable.

In *Walker v. Fuller*, 223 Mass. 566, 112 N. E. 230, plaintiff was injured while riding in an automobile driven by one Woods, an employee of the defendant. The plaintiff was also in the defendant's employ, but had finished his work for the day and, while waiting to take a street car, saw Woods drive out of the defendant's yard. He asked him if he was going to town and, when the latter replied that he was, got into the automobile, and was injured by reason of the negligence of the driver. It was held that the defendant was not liable, that plaintiff was not being carried in the automobile at the time he was injured by reason of any invitation of the defendant, or any one in his employ who was authorized by him to extend such an invitation.

In *Driscoll v. Scanlon,* 165 Mass. 348, 43 N. E. 100, it was held that if a driver of a cart invites an infant to drive with him, either for pleasure or to take his place in driving while he sleeps, and the infant falls from the cart and is run over by it, the act is outside the driver's authority and his master is not liable to the infant.

In *Kiernan v. New Jersey Ice Co.* 74 N. J. L. 175, 63 Atl. 998, a servant in charge of an ice-wagon, without authority to do so, gave permission to a person to take a piece of ice from the wagon, and then, while the person was in the act of taking the piece of ice, the servant assaulted him. Held, that the master was not responsible for the assault.

In *Dougherty v. Chicago, M. & St. P. R. Co.* 137 Iowa, 257, 114 N. W. 902, and *Hoar v. Maine Cent. R. Co.* 70 Me. 65, children were killed while riding on a hand-car by permission of the section foreman. In each case it was held that the section foreman was not acting within the scope of his authority in inviting the children to ride upon the hand-car, and that the companies were not liable.

In *McQueen v. People's Store Co.* 97 Wash. 387, 166 Pac. 626, it was held that the driver of a delivery truck acted outside the scope of his employment when he invited girls to ride on the running-board of the car, and the employer was not liable for injury sustained through the negligence of the driver.

In *Schulwitz v. Delta Lumber Co.* 126 Mich. 559, 85 N. W. 1075, it was held that a master is not liable for the negligence of his servant in permitting a boy, contrary to the master's orders, to ride upon a wagon provided for the servant's use in hauling lumber, such act not being within the scope of the servant's employment.

Authorities to this effect could be cited almost *ad infinitum*. A number of others are cited in *Rolfe v. Hewitt*, 227 N. Y. 486, 125 N. E. 804. Those reviewed here are done so for the purpose of emphasizing the fact that in order to make the master or principal responsible for injuries sustained by one whom the master's chauffeur or servant invites to ride, it must appear that the servant was acting within the scope of his authority, either actual or apparent, in extending the invitation, and that in the case of a com-

mon automobile or truck operated by a servant there is no apparent authority to extend such an invitation.

In the instant case plaintiff's husband had no actual authority from the corporation to invite her to take this trip, and the brother-in-law had no authority to bind the company by his acquiescence therein. I therefore reach the conclusion that the defendant corporation owed the plaintiff no duty whatever while she was upon this trip pursuant to her husband's invitation, not in promotion but in derogation of the interests of the corporation. Assuming, however, that she was the guest or licensee of the company in accepting the invitation, she took the truck with its defects and the driver with his infirmities, and the only duty owed by the company to her was to exercise due care not to increase the danger or to add a new one to those which she assumed in accepting the invitation.

The circumstances from which the accident resulted are as follows: While the truck was passing through Ohio, it came to a long and steep hill. Plaintiff's husband was driving. He surveyed the hill and considered that it would be necessary to shift into third speed, there being four speeds on the truck. This he did, but on the way down the hill the truck got out of his control, because of the grade of the hill, and it became apparent that he should have shifted into a still slower speed. When he discovered that the truck was getting beyond his control, he made an effort to shift into second speed. Whether this proved successful does not appear. At any rate, the truck went on down the hill, out of his control, and ran into a house, causing plaintiff's injuries.

It is not contended that the effort of Mr. Hensel to shift into a lower speed constituted negligence. The jury found him guilty of negligence in that he failed to maintain a lookout, and that he was negligent in the control and management of the truck. It is apparent that he did maintain a

lookout. When he came to the brow of this hill he saw the hill before him. He saw that it was a hill with considerable grade and, as a precaution, he shifted into third speed in order to give the van or truck greater braking power. Now the difficulty arose because he did not properly estimate the grade or perhaps the length of the hill. That he did maintain a lookout, however, is indicated by the fact that he prepared for what no doubt appeared to him to be a sufficient braking power by shifting into third speed. The contention made to justify the finding of the jury that he did not maintain a lookout is to the effect that the lookout was not efficient because, if it had been efficient, he would have realized the grade and length of the hill and known that he should have shifted into a still lower speed. This amounted to no more than a failure to exercise proper judgment with reference to the speed into which he should have shifted in order to have secured the proper braking power.

True, an efficient lookout requires a person to see that which is in plain sight. It requires him to see a railroad train coming on a railroad track, or an automobile approaching at an intersection. These are tangible objects which may not be overlooked when an efficient lookout is maintained. However, the correct estimate of the grade or length of a hill involves something besides mere lookout. It involves the exercise of judgment. Where a person sees a hill but fails to properly appraise the length of grade of the hill, the fault is not that of lookout but that of judgment. Distances are often deceptive. So are grades. A city dweller traveling on the plains may estimate a mountain range to be ten miles distant, while a cowboy would know it was at least fifty. The difference between the two is the character of their judgment. So when this truck came to the top of the hill, although the hill lay before the driver in plain sight, he was called upon to exercise judgment concerning the braking power required to safely descend the

hill. He failed in that judgment and the accident resulted. It was an accidental and not a negligent act.

It is settled in this state that the guest takes the driver with such defects in his skill and experience as is known to the guest. This was settled in *Cleary v. Eckart*, 191 Wis. 114, 210 N. W. 267, where the guest knew of the inexperience of the driver, and the expression went as far there as was required by the facts of that case. However, logic requires that the guest take the driver with whatever skill he may possess. There is no reason why the guest should be permitted to insist upon any particular degree of skill on the part of the driver. When the guest enters the car he or she commits herself or himself to the care and protection of the driver so far as the driver is enabled to extend care and protection, and no farther. The wayfarer who is given "a lift" on the highway by the driver of an automobile knows nothing of the experience or skill of the driver, yet he unhesitatingly accepts the invitation to ride. There is no reason why he should be permitted to insist upon a greater degree of skill and experience than that which the driver actually possesses and is capable of exercising for his own protection. Judgment is an essential element of skill. One who has poor judgment will never become the accomplished driver that one who possesses good judgment may become. In this case the driver had abundant experience in driving moving vans on distant trips throughout the country. He was charged with the responsibility for his own life, for the life of his wife, and for property in which he had a large interest. While these considerations are not conclusive that he exercised his best judgment, they are nevertheless quite persuasive.

In *Harter v. Dickman,* decided herewith (*ante,* p. 283, 245 N. W. 157), the integral nature of skill and judgment are pointed out, and it is there held that the guest assumes the risk of such lack of skill as may characterize the driver of

the vehicle. With this holding I am in complete accord, and I think its application here indicates that the accident which caused plaintiff's injuries was attributable to the lack of skill of defendant's driver which was assumed by the plaintiff when she started upon the trip rather than the driver's negligence.

For these reasons, I think the plaintiff has no cause of action against the defendant corporation, and that the judgment should be reversed and cause remanded with directions to dismiss the complaint.

I am authorized to state that Mr. Justice NELSON concurs in the foregoing dissent.

FAIRCHILD, J. (*dissenting*). In dissenting from the majority opinion I am not unmindful of the difficulty which arises in determining whether a certain set of facts is within a rule or controlled by the exception to that rule.

A driver, always confronted with a problem as he proceeds on his course, is bound to consider any new element entering into this problem, such as a curve or a steep hill. If he is inadvertent, does not see the new element, or steers his course without considering the change in his situation, he fails to keep a proper lookout, but if he, upon seeing it, in the use of his judgment concludes upon a course of car management or direction which proves to be erroneous, the result is then due to lack of skill. When the evidence shows proper lookout, consideration of present and controlling elements, and the forming of a judgment, his failure, if any, to properly meet the emergency and overcome all difficulties cannot by his guest be said to be due to inadvertence. Host and guest are moving together; the guest is in a position to know something about what the host is doing and may be of help. The attitude of each toward the other does not arise from the relation which necessarily comes into being between the host and other users of the highway. No driver is infallible, and in the relation of host and guest the occa-

sional failure in the matter of forming a judgment by the host to function up to a perfect standard in that particular is one of the elements in the combination of the host-and-guest relation which the guest expected to travel with when she entered into the relation and is a part of the risk which she assumed.