ALICE TURNER MULLALLY v. LANGENBERG BROTHERS GRAIN COMPANY, a Corporation, Appellant.—98 S. W. (2d) 645.

Division One, November 12, 1936.*

*Hollingsworth & Francis, Joseph N. Hassett* and *Ernest E. Baker* for appellant.

*NOTE: Opinion filed at September Term, 1935, April 23, 1936; motion for rehearing filed; motion overruled at September Term, 1936, November 12, 1936.

*Eagleton, Waechter, Yost, Elam & Clark* for respondent.

FERGUSON, C.—Daniel S. Mullally, plaintiff's husband, was employed by the defendant, Langenberg Brothers Grain Company, a corporation. The company "furnished" him "an automobile in connection with the business." This automobile "was garaged and kept" at the home of Mr. and Mrs. Mullally in the city of St. Louis. On Saturday afternoon, September 12, 1931, they drove, in this company automobile, to a summer "lodge," near Portage de Sioux in St. Charles County, owned by their friends, and hosts on this occasion, Mr. and Mrs. Carton. The Mullallys spent Saturday afternoon and night and the following day (Sunday) as guests at the Carton lodge leaving there "about seven-thirty" Sunday evening to return to their home in St. Louis. Mr. Mullally was driving the automobile and at a point on Highway 94, in St. Charles County, where the highway crosses over a narrow bridge the automobile was driven against or struck "a fence" or guard "railing" at the side of the entrance to the bridge and Mrs. Mullally was injured. Alleging that at the time her husband was "operating" the automobile "as the agent and servant of the defendant," "within the line and scope of his employment for the defendant" and that he so negligently and carelessly, in several respects specified, operated the automobile as to cause it to strike the "fence or railing," she brought this action against the defendant company for damages for the injuries she sustained. Upon a trial in the Circuit Court of the City of St. Louis plaintiff had a verdict and judgment in the amount of $18,500 and the defendant appealed.

Appellant's first contention is, that as the wife could not maintain an action against the husband for damages on account of injuries caused by his negligence the same immunity applies to the husband's employer where the action against the employer, as in this case, is based solely upon the doctrine of *respondeat superior*. Respondent concedes: "That, under the law of this State, as it exists at the present time, a wife cannot maintain a civil action against her husband for damages for personal injuries sustained by reason of his negligence," but says that does not preclude a recovery by the wife against the employer under the *respondeat superior* rule if the negligent act causing the injuries occurred while the husband was in the performance of the duties of his employment and acting in the course and within the scope of that employment. The rule in this State is, as stated, that "a wife cannot maintain a civil action against her husband for a personal tort." The reason and basis of the rule is fully stated in Willott v. Willott, 333 Mo. 896, 62 S. W. (2d) 1084, and Rogers v. Rogers, 265 Mo. 200, 177 S. W. 382. In the Willott case we held that a wife could not maintain a civil action against her husband for injuries sustained from the husband's negligent operation of an automobile. But we find no Missouri decision, and none is cited by

the parties, ruling the question whether, alleging that she sustained personal injuries on account of the negligence of her husband while he was acting in the course and scope of his employment, a wife can maintain an action for damages against her husband's employer. There are two distinct lines of authority upon this question; one holding that the wife can recover from the husband's employer, under such circumstances; the other holding she cannot. We have examined these decisions and it is our conclusion that upon both legal principle and public policy the wife has a right of action against the husband's employer. The leading decision announcing such rule is the New York case of Schubert v. August Schubert Wagon Co., 249 N. Y. 253, 164 N. E. 42, affirming 223 App. Div. 502, 228 N. Y. Supp. 604. We quote from the opinion by Judge CARDOZO:

"The disability of wife or husband to maintain an action against the other for injuries to the person is not a disability to maintain a like action against the other's principal or master. There are, indeed, decisions to the contrary by courts of other states. (Citing cases.) We are unable to accept them. True, of course, it is that a master is not liable for the act of his servant, under the rule of *respondeat superior*, if the act itself was lawful. . . . A judgment to that effect in an action against the servant may be pleaded as a bar in an action against the master. . . .

"An employer commits a trespass by the hand of his servant upon the person of another. The act, let it be assumed, is within the scope either of an express mandate or of an implied one. In either event, if the trespass is not justified, he is brought under a distinct and independent liability, a liability all his own. The statement sometimes made that it is derivative and secondary . . . means this, and nothing more: That at times the fault of the actor will fix the quality of the act. Illegality established, liability ensues. The defendant, to make out a defense, is thus driven to maintain that the act, however negligent, was none the less lawful because committed by a husband upon the person of his wife. This is to pervert the meaning and effect of the disability that has its origin in marital identity.

"A trespass, negligent or willful, upon the person of a wife, does not cease to be an unlawful act, though the law exempts the husband from liability for the damage. Others may not hide behind the skirts of his immunity. . . .

"We are told that in the long run the consequences of upholding an action against the master may be to cast the burden on the husband, since the master, if not personally at fault, has a remedy over. (Citing cases.) The consequence may be admitted, without admitting its significance as a determining factor in the solution of the problem. The master who recovers over against the servant does not need to build his right upon any theory of subrogation to a cause of action

once belonging to the victim of the injury. A sufficient basis for his recovery is the breach of an independent duty owing to himself. The servant owes the duty to the master to render faithful service, and must answer for the damage if the quality of the service is lower than the standard.''

The opinion in the same case in the Appellate Division of the Supreme Court of New York also well and clearly reasons the question as follows:

''The United States courts and a majority of the State courts have decided that the various statutes relieving married women from the restrictions placed upon them at common law have not had the effect of giving them the right to recover from the husband damages for torts. . . .

''The fact that the plaintiff cannot recover against her husband in this case does not, in our opinion, prevent her from recovering against the husband's employer.

''The law makes the master liable for the negligent injury of a third person by the master's servant, while acting in the course of his employment. The negligent injury is a wrong which gives to the injured person a remedy against the master. The negligent and wrongful act of the servant is deemed the act of the master. If a woman is injured by a negligent and wrongful act of a servant, the act is no less negligent and wrongful because the injured person happens to be the wife of the negligent servant. If a negligent act of a servant should result in injury to his wife and a third person, to hold that the third person could recover from the master, but the wife could not, would present, at this day and age, rather an anomalous situation, and one that would not appeal to one's sense of right and justice. . . .

''The cases which hold that the master's liability is based upon the negligence of the servant, and that the master cannot be held liable unless the servant was negligent, and that, if there can be no recovery against the servant, there can be no recovery against the master, do not sustain the defendant's contention. . . . Those cases decide only that, if the servant charged with doing a negligent act did not, in fact, act negligently, then the master, whose liability is founded upon the doctrine of *respondeat superior*, is not liable, because the alleged negligent act was not, in fact, negligence, and, as the servant was not negligent, the master cannot be held to have been negligent. . . .

''A judgment in favor of the servant in an action against him is a bar in favor of the master, in an action against the master, not primarily because the master in such action is secondarily liable, and the servant primarily liable, but because there has been an adjudication upon the facts that there was no negligence on the part of the

servant. . . . A master's liability is not based primarily upon the fact that the servant, who did the negligent act, is liable over to the master for the damages which the master has been compelled to pay to the injured party. The primary liability grows out of the wrong done by the servant while acting for the master."

The following decisions cite the Schubert case and adopt the rule which it announces; Poulin v. Graham, 102 Vt. 307, 147 Atl. 698; Hensel v. Hensel Yellow Cab Co., 209 Wis. 489, 245 N. W. 159; Metropolitan Life Ins. Co. v. Huff, 48 Ohio App. 412; 194 N. E. 429.

This brings us to a crucial question which appellant presents— Is there substantial evidence tending to show that at the time of the accident plaintiff's husband was operating the automobile in the service of his employer and in the course of his employment? The testimony of plaintiff and her husband was the whole of the evidence on this phase of the case. At the conclusion of the evidence on the part of plaintiff, defendant requested an instruction directing a verdict in its favor which was refused. Defendant offered no evidence, stood on its request for a directed verdict, in the nature of a demurrer to the evidence, and assigns the refusal thereof by the trial court as error. A summary of the evidence, the sufficiency of which is challenged, follows: Mr. and Mrs. Mullally had married in April prior to this accident which occurred September 13, 1931. In 1931 she was forty-seven years of age and he was fifty-five years of age. Mr. Mullally had been employed by the defendant Grain Company thirty-one years. He testified: "My duties with the Langenberg Brothers Grain Company are the selling of grain, hay, securing consignments, soliciting consignments and in general operating the coarse grain department in connection with the hay business. I have entire charge of operating that department." He stated: "The company furnished me with an automobile in connection with the business. It was a Ford Tudor sedan. (The automobile involved in this accident.) The Ford was garaged and kept at my residence. Langenberg Brothers Grain Company paid for the maintenance of the automobile, the gasoline and oil and everything that was necessary for its use. I used the automobile in the hay tracts—the selling of hay; I used it for trips to the country." Mr. and Mrs. Mullally resided in the city of St. Louis as did Mr. and Mrs. Carton. Plaintiff, Mrs. Mullally testified, that she had known Mrs. Carton since childhood and "we were childhood friends. We both lived in Kansas City. That was my home prior to my marriage to Mr. Mullally. Mrs. Carton moved to St. Louis first. After I came to St. Louis we renewed the friendship. I visited at her home here in the city many times. They (Mr. and Mrs. Carton) have visited at my home many times. Mrs. Carton and I were the closest kind of personal friends." The Cartons owned a summer "lodge" in St. Charles County near Portage de Sioux.

Both Mr. and Mrs. Mullally stated that they had been to the Carton lodge as guests on two occasions prior to this September 12th, 13th visit. We now undertake to collect and set out all of the evidence relating to how and why Mr. and Mrs. Mullally made this visit to the Carton lodge. Mrs. Mullally testified: "The arrangements were made to go out on this trip Saturday morning. I made the arrangements with Mrs. Carton;" then the following occurred: Plaintiff's attorney. "Q. You may give us the circumstances. A. Mrs. Carton called me (by telephone) and asked me if we (Mr. Mullally and herself) would like to go out on Saturday and spend Sunday with them and I said I would first have to ask Mr. ————." Defendant's attorney: "I object to the testimony as to what she said or Mrs. Carton said." The COURT: "That will be sustained. State just what you did there." "A. I had to get his (evidently referring to Mr. Mullally) consent before I could go. I asked him if he wanted to go and he told me ————." Defendant's attorney: "I object to what he said." The objection was not ruled but the witness did not state what her husband said and continued by saying: "We then went out Saturday afternoon." On cross-examination Mrs. Mullally testified concerning the arrangements by telephone Saturday morning as follows: "Mrs. Carton called me from her home in St. Louis on Saturday, September 12th, and invited me to go out to their home in the country. She asked me to bring some lunch along. She did not suggest what I should bring and what she should bring. In other words, we wanted to bring along provisions for the next couple of days. I took out some potato salad. My maid made it up that morning. I think I made some sandwiches, I don't know whether anything was said about any liquor refreshments." Mr. Mullally's testimony seems somewhat indefinite. We quote certain portions thereof in full. Mr. Mullally having related his "duties with the" defendant grain company, which we have quoted, supra, that is, "the selling of grain, hay, securing consignments—soliciting consignments and in general operating the coarse grain department in connection with the hay business," the following occurred; plaintiff's attorney: "Q. State what knowledge, if any, is required with reference to crops while they are growing, or, after they have finished growing, for that matter, state what knowledge you have, or you are required to have? A. The knowledge obtained in driving through the country in examining crop conditions enables one to get out market reports, to give an opinion. Very seldom do I ever dictate a circular that I do not express some opinion as to the future of the market. One of the ways I have of learning that is examining the conditions personally. I dictate such a circular on the average of three to four times a week; a market letter as we call it." Mr. Mullally testified; that he had an engagement to play golf on that Saturday afternoon but "I made up my mind that (Saturday)

morning to go out to Ben Carton's lodge;" and "I do not recollect that my wife called me at the office and asked me to take her to the Carton lodge—I telephoned her at this time and told her I wanted to make a trip there sometime or another. I do not recollect that the whole thing started by a telephone call from my wife on Saturday morning." But apparently some arrangement was made between them by telephone to accept Mrs. Carton's invitation for Mr. Mullally further testifies that when he left the grain company's place of business, on Saturday afternoon, he drove to his home in this company automobile (the Ford automobile involved) and parked it at the rear of his home. We now quote his testimony which follows: "Q. Then what did you do? A. Invited Mrs. Mullally to accompany me. Q. Invited her then? A. I invited her to go with me in this car. (the company automobile.) Q. How long were you there at home? A. About twenty or twenty-five minutes. Q. Now while you were there at your home waiting for her what did she do? A. She gathered some things up and joined me. Q. She was waiting for you to come and take her wasn't she? A. She thought she would go in another automobile. Q. She was waiting there at your home for you to come and take her out to Cartons', wasn't she? A. She expected to go out with me." We think the conclusion necessarily follows, from the foregoing testimony, that plans had been made during the morning (Saturday) between husband and wife, undoubtedly by telephone, whereby he decided to forego his golf engagement and accompany his wife to the Carton lodge for the Saturday afternoon, night and over Sunday visit as the guests of the Cartons; that Mrs. Mullally "expected to go out" to the lodge with him and was waiting for him to call for her at their home; that Mrs. Mullally "thought" they would go "in another automobile," doubtless her own automobile as she testified that she owned a Buick automobile at the time; and that he decided to make the trip in the company automobile and "invited her to go with" him "in this car." Plaintiff's attorney asked Mr. Mullally: "What was the occasion for you going out on Saturday afternoon with your wife accompanying you—this Saturday afternoon—September 12, 1931? A. To inform myself on crop conditions." From their home Mr. and Mrs. Mullally drove by the most direct route to the Carton lodge. They went first to St. Charles, thence north over Highway 94 to the Grafton Ferry Road, over that road for about two and one-half miles to and through a "lane," about a mile in length, to the Carton lodge. They did not vary or turn aside from this direct route or stop except Mr. Mullally testified that he made one stop and got out of the automobile "to examine a field of corn and looked at a couple of ears of corn to see whether they were denting. If the corn was denting, it signified to me it was maturing and was out of the way of frost damage, I considered it was a bearish

factor in the market." Mrs. Mullally stated: "On the way out I saw Mr. Mullally slow down when he came to corn fields. On one occasion he got out and examined something and came back." Mrs. Mullally testified: "We arrived there (the Carton lodge) about half past one or two o''clock. It might have been two-thirty. Mr. and Mrs. Carton were there. We did not play cards that afternoon. The men were out and Mrs. Carton and I sat on the front porch and talked. We played cards Saturday night, after we had our evening meal, until about eleven o'clock. Just the four of us there at the lodge." The next morning (Sunday), "between nine and ten o'clock," Mr. and Mrs. Mullally drove to Portage de Sioux to attend a Catholic Church. Both Mr. and Mrs. Mullally stated that "it was our customary habit to attend church on Sunday morning." Mr. Mullally said, "I always go to church on Sunday morning." Mr. Mullally stated that upon arrival at the church they learned they were late "for mass" so "we waited until the next mass and after services were over Mrs. Mullally got in the car and I stopped and talked to a gentleman there. I didn't know who he was and I handed him a business card." "Q. What was the purpose in handing the business card? A. The firm I am connected with handles a great deal of grain from St. Charles County . . . and I figured that in handing out cards it would have some effect on a farmer—any farmer that might be there." Mr. Mullally's testimony continues: "I examined a field of alfalfa returning from church. That is an item I handled in connection with the business of the company. I try to get first hand knowledge in order to write these letters." There are two routes from the Carton lodge to Portage de Sioux. Mr. and Mrs. Mullally went to church and returned to the lodge over the same route "because it is the shortest." Sometime Sunday the Cartons' daughter and her husband arrived at the lodge. Mrs. Mullally says; "We served the noonday meal on Sunday around one o'clock." We now quote from Mr. Mullally's testimony concerning the events of the afternoon—Mrs. Mullally's testimony is substantially the same: "After we got back from church I had a highball. I drink whenever I get the chance these days. I have been drinking since I was eighteen years old. We had lunch about one o'clock. We then sat around until after three. Then we went down to the river and went in swimming; it was a very warm day. After returning from swimming, before we changed clothes, I had a highball. Then after changing clothes I sat around the house and talked and had another highball before eating. I believe my wife had one or two highballs. Then we had a cold meal about seven o'clock, or a quarter to seven. I do not drink after meals. I make it custom never to drink whiskey after eating a meal. At about seven-thirty we left the lodge for home. By that time it was dark. I believe it gets dark about seven or seven-thirty. At the time I left the lodge

I had the lights burning on my car. . . . I judge I had been driving fifteen or twenty minutes after I left the Carton home until I struck the railing.''

We have gone into detail and have fully set out the evidence (consisting wholly of the testimony of plaintiff and her husband) upon which plaintiff relies to show that at the time of the accident her husband was operating the automobile in the service of his employer and in the course of his employment. It seems apparent and conclusive that the inducing and controlling object and purpose of the trip and visit to the Carton lodge, from its inception to its conclusion, was personal, social and recreational. Mr. Mullally stated that the automobile was ''furnished'' to him by the company ''in connection with the business'' and that his duties were ''the selling of grain, hay, soliciting consignments and in general operating the coarse grain department in connection with the hay business;'' that he dictated a ''market letter'' three or four times a week; and that ''knowledge'' of crop conditions ''obtained in driving through the country enables one to give an opinion as to the future of the market.'' He nowhere says that he customarily, or even at any time, drove about the country for the sole purpose of observing crop conditions. He says he used the automobile in selling hay and ''I used it for trips to the country.'' The only inference which naturally follows is that he used the automobile in performing the duties of his employment, the selling of grain and hay and the solicitation of consignments, which took him from time to time on trips in the country and that on these trips he observed crop conditions which aided him in forming an opinion as to future market conditions. Mr. Mullally had not contemplated the doing of work or anything in connection with his employment on this Saturday afternoon. He had an engagement to play golf that afternoon. Would the contention be seriously made that had he while driving to the golf course chanced to observe a field of corn and had stopped and ''looked at a couple of ears to see whether they were denting'' that such act transformed his trip to the golf course and the return therefrom into a mission for his employer and that he was therefore in the course of his employment in going to and returning from the golf course? It nowhere appears that any situation arose making it either necessary or expedient that he forego the golf engagement and instead make a trip into the country in his employer's behalf to inspect crop conditions. The whole course of events plainly shows that Mr. and Mrs. Mullally were on pleasure and recreation bent; that he abandoned his contemplated afternoon of golf for the other form of recreation afforded by the Carton invitation to their lodge. He did not spend the afternoon or the major part driving about the country for the purpose of inspecting crop conditions but went from his home by the most direct route to the Carton lodge

arriving there not later than two-thirty in the afternoon, as plaintiff states. Naturally he or any other person interested in crops or the grain business would have observed crop conditions along the route. The trip to church Sunday morning was certainly not in connection with his employer's business and that he "stopped and talked to a gentleman there," whom he did not know, and handed him a business card is a circumstance of no significance. That he "examined a field of alfalfa returning from church," we repeat, was but the natural interest which anyone engaged in his line of business would display. It will be noted that while there were two routes from the lodge to the church Mr. Mullally went and returned by the same route. Plaintiff apparently contends that in going to and returning from the Carton lodge, and in going to and returning from church and while there after services Mr. Mullally was about and engaged in the business of his employer and acting in the course of his employment by it. But the facts negative that theory. Plaintiff cites cases involving a presumption but plaintiff's own evidence overcomes any presumption arising from the fact alone that an employee was driving his employer's automobile at the time of the accident. As stated, it does not appear that any business necessity or expediency required that Mr. Mullally make a trip on Saturday afternoon for the purpose of inspecting crops and that had the invitation to the Carton lodge been canceled, that is the social and recreational trip been dropped, that he would nevertheless have gone on a crop inspection trip that afternoon. We think it an inescapable conclusion, from the testimony of Mr. and Mrs. Mullally, that the trip to the Carton lodge, in its entirety, was a social and recreational excursion, that such observation of crop conditions as Mr. Mullally made were merely casual and incidental and such as any person engaged in his line of business might ordinarily and naturally make and that he cannot be said to have been engaged in his employer's service and in the course of his employment in the sense that imposes liability upon it. Applying the tests of McMain v. J. J. Connor & Sons Construction Co., 337 Mo. 40, 85 S. W. (2d) 43, we must hold that the evidence is not sufficient to make a case for the jury and that the demurrer to the evidence should have been sustained. With this view it is unnecessary to discuss the sufficiency of the evidence to show that plaintiff was an invitee of defendant company.

It follows that the judgment of the circuit court should be reversed. It is so ordered. *Hyde* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All the judges concur.