NAOMI HOLLEY (Claimant), Plaintiff-Appellant, v. ST. JOSEPH LEAD COMPANY (Employer), Defendant-Appellant.—39964.—201 S. W. (2d) 941.

Division Two, April 21, 1947.

Rehearing Denied, May 12, 1947.

*Parkhurst Sleeth, John S. Marsalek* and *Moser, Marsalek, Dearing & Carpenter* for appellant St. Joseph Lead Company.

*Victor B. Harris* and *Harold C. Hanke* for plaintiff-appellant Naomi Holley.

WESTHUES, C.—Plaintiff, Naomi Holley, was awarded $11,646.80 as compensation for the death of her husband, the result of a fall into a mine shaft. Claimant, in addition to compensation, asked that the award be increased by fifteen per cent as authorized by sections 3691 and 14831, Mo. R. S. Ann., R. S. Mo., 1939. On appeal to the circuit court the award of the Compensation Commission was affirmed and an appeal to this court was taken by both parties, defendant from the award, claimant from the denial of awarding an additional fifteen per cent. We shall refer to the parties as plaintiff and defendant.

Defendant's principal contention is that the injury and death of Holley did not arise out of the employment but were solely attributable to and the result of Holley and other of defendant's employees engag-

ing in a friendly water fight. Due to this contention it will be necessary to state the facts in detail.

The defendant, St. Joseph Lead Company, was engaged in mining lead in St. Francois County, Missouri. The mine shaft into which Holley fell was about five hundred feet deep. Holley and one Daugherty worked together as skip loaders at the bottom of the shaft. Their working hours were from 10:00 A. M. to 6:30 P. M. The men working in the mine on the day shift, about seventy-five in number, would quit work at 3:00 P. M., at which time they would come to the surface by means of a cage and hoist and be replaced by the night shift. Holley and Daugherty would also come to the surface at this time and wait until all of the day shift had left the mine, then at about 3:20 they would return to the mine and resume their work. On September 21, 1944, while this change in shifts was in progress, a number of men engaged in a friendly water fight. It was in evidence that the men had engaged in such conduct previously although it was forbidden. In so far as Holley was concerned the evidence shows the following: Watkins and others were sitting on a ledge and while in that position Holley poured water in Watkins' hip pocket. Watkins immediately procured a can of water and Holley ran toward the shaft followed by Watkins. Holley opened the gate of the shaft and gave a signal to the engineer by pulling twice on an electric device, which was the customary signal if one wished to go down. The shaft gate was equipped with an electric safety device which controlled a red light in the engineer's station. This red light would show so long as the shaft gate was open. There was evidence that Holley, after he stepped on the cage, slammed the gate shut, however, it bounced back and did not close. The evidence also shows that Holley then reached over to close the gate and when he did so the cage went down; that his head and body came in contact with the edge of the shaft causing him to fall backwards off the cage into the mine. There was no gate on the cage itself. The gate was at the top of and about eighteen inches from the edge of the shaft. Around the shaft was what was called a bull pen consisting of a fence enclosing the shaft. This fence was about twelve feet from the gate at the shaft. A number of witnesses, including Watkins, testified that he did not pursue Holley any further than the gate at the bull pen. One witness, however, testified that Watkins pursued Holley further and threw water on him while he was in the cage waiting for it to descend. It was conceded that it was time for Holley to return to work. All witnesses, who testified concerning the point, stated that Holley closed the gate a second time, or stating it in another way, that Holley, immediately before the cage descended, reached for the gate. One witness testified as follows:

"Q. When did the cage move? A. Well, after that Holley kind of pitched forward, looked like, like he was going to pull the gate to

but I would not say he hit the cage with his hands, but, anyway, while in that position the cage went down.

"Q. The cage went down? A. The cage went down. Looked to me like his chin caught that sill timber, and the last I seen his hat went off his head and his head went straight back." Watkins testified as follows on cross-examination:

"Q. At the time this elevator went down, how close were you to the cage? A. I would say ten or twelve feet."

. . .

"Q. How soon after he got on the cage did he give the signal for the cage to go down? A. Just as quick as he got on.

"Q. That was even before he got the gate shut? A. The gate wasn't shut enough to make contact.

"Q. He gave the signal before it was shut? A. The gate was shut but it had not made contact—I don't know what you call the things."

. . .

"Q. He gave the signal—he was running, wasn't he? A. No, he did not run on the cage.

"Q. You were after him with that can of water? A. He ran around the cage. He quit running when he got on the cage."

Rosser C. Brophy, an employee of defendant, occupying the position of mine captain, testified as follows:

"Q. When this gate is opened, this gate just outside the cage, a red light shows the engineer in the hoist room, does it not? A. Yes, sir.

"Q. And when that light goes off what does the engineer do? A. He has the signal to move the cage.

"Q. How does he do that, move a lever or something? A. Yes, sir.

"Q. This cage does not start automatically when the light goes off, but it takes the engineer to move a lever? A. Two levers.

"Q. And the engineer has to do that manually with his hands? A. Yes, sir.

"Q. Did you observe whether or not sometimes this gate might apparently close but not fully latch? A. There is no latch ▇▇ on the gate. There is a spring on it and when it comes up against the post it ordinarily stays there but if you slam it it will bounce back.

"Q. Bounce back? A. And the spring is not strong enough to pull it.

"Q. And the gate might be ajar and not fully closed? A. About an inch."

▇▇ Defendant in its brief states:

"When Holley went on to the hoist and gave the signal for it to descend, according to all the evidence he did so for the purpose of

preventing Watkins from throwing water upon him. The accident was the direct consequence of the conditions produced by the water fight—and the attendant haste and confusion, and not of the conditions produced by the employment.

"The mere fact that Holley and Daugherty, if they had followed the proper course of their duty, would have descended on the hoist at about the time the accident occurred, is a mere coincidental circumstance, which does not alter the essential character of the conduct in which Holley was actually engaged."

The Compensation Commission evidently did not agree with that line of reasoning. Neither did the circuit court on review, as evidenced by an opinion filed with this record. Nor can we agree with defendant. It is a fact that Holley threw water on Watkins and ran from him to the shaft, entered the cage and immediately gave the "go-down" signal. However, it was conceded that it was time for Holley to return to work and that in doing so it was necessary for him to enter the cage and give the signal to go down. We must remember that Holley entered the cage and gave the signal to go down, but that the engineer did not respond to the signal given because the gate at the shaft was not entirely closed and therefore the red light in the hoisting engineer's room remained on. We may ask, why was the gate not closed? The answer to this question was given by the mine captain who stated that the spring which should have kept the gate closed was too weak to perform its function, therefore, it was necessary for Holley, or anyone else in his position wishing to go down, to reach over and close the gate so as to extinguish the red light. To reach over and close the gate, after the engineer had received the signal to lower the cage, placed such a person in danger of coming in contact with the edge of the shaft. It required quick action to remove the arm and body in time to avoid this contact with the shaft. The gate, as the evidence shows, was eighteen inches beyond the edge of the shaft.

As we view the situation it was the water fight that was a mere coincidental circumstance in this tragedy. Holley was not injured as the result of the water fight, no one pushed him and he did not fall because he was running, in fact he was standing still on the cage waiting for it to descend. However, the cage would not descend because due to a defective spring the gate was not entirely closed. When Holley reached to close the gate, and did close it, the cage went down and he evidently failed to get out of the way of the edge of the shaft. The finding of the Compensation Commission, that the injury arose out of the employment, is, therefore, not forced and artificial as defendant urgently insists. We find ourselves in agreement with the finding of the Compensation Commission. We will refer to a few cases cited by defendant. In Tabor v. Midland Flour Milling Co., 237 Mo. App. 392, 168 S. W. (2d) 458, the injury was directly caused by

the horseplay. Measuring the present case by the rule there announced, see 168 S. W. (2d) l. c. 460, 461 (5, 6), plaintiff would be entitled to an award.

Defendant urges that Holley's death is not compensable because he deliberately violated two specific orders of his employer. The first order was that employees should not engage in horseplay on the premises; the second, that Holley and Daugherty should go down in the shaft together when going to work. To this defendant cites Miliato v. Jack Rabbit Candy Co. (Mo. App.), 54 S. W. (2d) 799 and Kasper v. Liberty Foundry Co. (Mo. App.), 54 S. W. (2d) 1002. In the Jack Rabbit Candy Company case the injured party attempted to use an elevator which he had no right to use. No such fact exists in the case before us. In the Kasper case, Kasper ▮▮▮ was injured while grinding a casting. It was strictly against the rules of the company for Kasper to do this. We have no such circumstance in this case. It will be noted that in both cases injury resulted directly from a violation of the rules. Had the rules been observed the injury would not have occurred. The most that can be said in the case before us is that the water fight may have been a contributing cause. As to the second rule, we fail to see wherein its violation had any connection with Holley's death. Had his coworker, Daugherty, been on the elevator this would not have closed the gate, neither would it have avoided someone reaching over to do so. Defendant also cites the case of McMain v. J. J. Connor & Sons Const. Co., 337 Mo. 40, 85 S. W. (2d) 43, but that case does not help defendant. McMain, so this court held, was on a personal mission, not required by his employer, at the time he lost his life. The same is true in the case of Mullally v. Langenberg Bros. Grain Co., 339 Mo. 582, 98 S. W. (2d) 645. In the case at bar Holley was where he was required to be, going to work by the usual route by means of a conveyance operated and controlled by the defendant company. A defect in the signal device was at least a material contributing cause of Holley's injury and death.

Defendant in its brief quotes a rule announced by the Kentucky Supreme Court in the case of Rex-Pyramid Oil Co. v. Magan, 287 Ky. 459, 153 S. W. (2d) 895. Defendant makes the following comment with reference to the rule:

"We submit that the above statement exposes clearly the fallacy of claimant's contention in this case."

The rule quoted reads as follows:

"Whilst a person injured or killed *as a result of engaging in horseplay* is not entitled to compensation under the Workmen's Compensation Act (citation), nevertheless, he will not be denied compensation by reason of previously having been engaged in such play if, at the time of the accident, he was in the course of his employ-

ment and the cause or source of the accident was *a hazard to which he was subjected by reason of his employment.* (Emphasis added.)''

In that Kentucky case an employee was killed while hurriedly crossing a highway toward his place of employment. He had been engaged in horseplay with fellow employees and while crossing the highway was looking back over his shoulder. Defendant seems to be of the opinion that the case clearly supports its theory. We see it as authority against its contention. After closely examining the evidence in this case and the authorities cited by defendant we have reached the conclusion that the Compensation Commission properly made an award in plaintiff's favor.

We also have for review the question of the amount of the award. Defendant insists that in any event if an award to plaintiff should be made it should not exceed $9,578. This requires an examination of the statute governing computation of awards and of the record to determine the amount of wages earned by Holley. At the hearing before the referee it was stipulated and agreed, ''. . . that during the year preceding the accident Holley earned a total of $2,451.15 from the St. Joseph Lead Company; that during that said year he lost 56 days from work by reasons not of his fault, due to illness and the like.'' The evidence disclosed that Holley had been a driller, but that about two months before his death he voluntarily, and with permission of his employer, changed his work to that of a skip loader. The defendant's mine superintendent testified that a skip loader's position was considered of a lower grade than that of a driller. Therefore, since there was a change in the grade of work performed by Holley and since he lost about fifty-six days due to illness, the proper method of computing the average earnings, so as to make a computation for an award, is prescribed by sec. 3710, subsection (d), R. S. Mo. 1939, Mo. R. S. Ann., which reads as follows:

''As to employees in employments in which it is the custom to operate throughout the working days of the year, the annual earnings, if not otherwise determinable, shall be regarded as 300 times the average daily earnings in such computation.''

The earnings of Holley, for the two hundred and forty-six days the evidence shows he worked, were $2,451.15, which means that his average daily wage was $9.964. This multiplied by three hundred equals $2,989.20, his annual earnings. The average weekly pay, therefore, was $57.484, two-thirds of which is $38.323. This multiplied by three hundred equals $11,496.80 and adding thereto $150 for burial expenses makes the total sum $11,646.80. This was the amount of the award as made by the Compensation Commission. In examining sec. 3709, subsection (b), and sec. 3710, R. S. Mo., 1939, Mo. R. S. Ann., and also the case of Mossman v. Chicago & Southern Air Lines, 236 Mo. App. 282, 153 S. W. (2d) 799, 1. c. 802, we find the Commission employed the proper method of arriving at the award.

400

■ Now as to the appeal by plaintiff. It is contended that defendant violated sec. 14831, R. S. Mo. 1939, Mo. R. S. Ann., and therefore the award should have been increased by fifteen per cent as authorized by sec. 3691, R. S. Mo. 1939, Mo. R. S. Ann. Sec. 3691, in so far as pertinent to this case, reads as follows:

"Where the injury is caused by the failure of the employer to comply with any statute in this state, or any lawful order of the commission, the compensation and death benefit provided for under this chapter shall be increased fifteen per cent."

That portion of sec. 14831, which plaintiff contends the mining company violated, reads as follows:

"The owner, agent or operator of every mine operated by shaft shall provide suitable means of signaling *between the bottom and the top thereof,* and shall also provide safe means of hoisting and lowering persons in a cage *covered* with boiler iron, so as to keep safe, as far as possible, persons descending into and ascending out of said shaft;" (Italics ours.)

The Compensation Commission refused plaintiff's request to increase the award. It evidently found that the death of Holley was not caused by a failure of the company to comply with the terms of sec. 14831. We are not justified in disturbing the finding of the Commission. Sec. 14831 specifically required the defendant to provide suitable means of signaling *between the bottom and the top* of the shaft and that the cage be *covered* with boiler iron. The evidence does not show that either of these specific provisions had anything to do with the death of Holley. The other provision requires that there be a safe means of hoisting and lowering persons in a cage. Plaintiff contends that this provision was violated because the cage itself did not have a lattice door or gate on the inside thereof. The evidence was that there was a bar about waist high on the inside of the cage. The bar worked on a spring and was in a vertical position unless placed in a horizontal position for the protection of men in the cage. The men riding in the cage usually, but now always, lowered the bar. The Commission evidently found that the construction of the cage, in so far as this case is concerned, complied with the terms of the statute.

The judgment of the circuit court affirming the award of the Compensation Commission is therefore affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.